**Troy Dale FARRIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69659.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 28, 1990.

Rehearing Denied Sept. 25, 1991.

Michael Logan Ware, Jack V. Strickland, Fort Worth, for appellant.

Tim Curry, Dist. Atty., C. Chris Marshall, David L. Richards, Michael Parrish and David Montague, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

■ Appellant was convicted of the offense of murder which was elevated to capital murder because he murdered Carl Rosenbalm, Jr., a peace officer, while Rosenbalm was acting in the lawful discharge of an official duty as a Tarrant County Deputy Sheriff. See V.T.C.A., Penal Code § 19.03(a)(1). After the jury answered the submitted special issues in the affirmative, see Art. 37.071, V.A.C.C.P., the trial judge assessed appellant the death sentence. Appeal to this Court is automatic. See Art. 37.071(h), V.A.C.C.P., Tex.R.App.Proc., Rule 40(b)(1). Finding no merit in appellant's twelve points of error, we affirm.[1]

In his first point of error, appellant challenges the sufficiency of the evidence to corroborate the testimony of Vance Nation, an accomplice witness. See Art. 38.14, V.A.C.C.P. The record reflects that on the night of December 4, 1983, on an isolated stretch of road in Tarrant County, Deputy Carl Rosenbalm of the Tarrant County Sheriff's Department was shot and killed by appellant. There were no eyewitnesses to the crime, although two individuals, Vance Nation and Charles Louder, who testified at appellant's trial, were evidently present when Rosenbalm was shot and killed. According to Nation's testimony at trial, he had arranged to drive from his residence in Wichita Falls to meet appellant in Fort Worth for an illegal drug transaction, to exchange marihuana for amphetamine. When Nation and Louder arrived at a prearranged rendezvous point, appellant was already there. Louder parked on the shoulder of the roadway, a short distance directly behind appellant's pickup truck. Nation then exited his vehicle, walked to and got inside of appellant's vehicle, where they completed their drug deal. Before they had separated, their meeting was interrupted by Rosenbalm's appearance on the scene. Nation testified that as he was leaving appellant to rejoin Louder, he noticed the head on approach of a marked police patrol car with its top lights flashing. Suddenly, the driver of the patrol car, who was identified as Rosenbalm, drove across the centerline and

---

1. Appellant also raises two points of error in a pro se supplemental brief. Appellant has no absolute right to hybrid representation, and we therefore do not address these additional points. *Scarbrough v. State,* 777 S.W.2d 83, 92 (Tex.Cr. App.1989).

stopped on the road, facing the wrong direction, adjacent to appellant's vehicle. At this time, Nation and Louder panicked. Nation testified that because the radio in appellant's vehicle was playing so loudly, and the patrol car's spot light was shining so directly in his face, that he could neither see nor hear what happened next between appellant and Rosenbalm. Putting his vehicle in gear, Louder drove it directly forward. By this time, appellant's vehicle had already left the scene and, as Louder drove through the place where it had been parked, and directly past the patrol car, he noticed Rosenbalm lying motionless on the ground. Louder and Nation both thought at first that Louder had driven his vehicle over Rosenbalm.

According to Nation, appellant later admitted to shooting Rosenbalm. Appellant confessed to his brother-in-law, Jimmy Daniels, that he had shot a policeman. Daniels testified at trial that appellant told him about the drug deal and about the appearance of Rosenbalm on the scene. Daniels went on to describe how, after Nation had returned to his vehicle, Rosenbalm got out of his patrol vehicle and demanded to know what was going on. At that point, according to Daniels, appellant fired several shots at Rosenbalm with a .357 Magnum pistol and then drove away. Through his rear view mirror, Daniels saw Rosenbalm on his hands and knees next to his patrol car, but did not learn until later that Rosenbalm had died as a result of a gunshot wound. Appellant also told Daniels that he had disposed of the murder weapon by throwing it from a pier into Marine Lake.

The evidence also established that Rosenbalm was wearing a bullet proof vest at the time of his death. Two .357 slugs struck his body, but only one was stopped by the vest. The other travelled through his left arm, entered his arm pit, and perforated both his heart and lungs, killing him within a few minutes. Although the medical examiner testified that the fatal shot was fired from a distance of three feet or more, the testimony of another forensic expert at least suggests that the shot might have been fired at much closer range. More-

over, other circumstances indicate that Rosenbalm was struck with his own flashlight before he was killed.

Rosenbalm was found lying on the paved roadway where his car was parked, partially beneath the still open, driver's side door. His service revolver, broken sunglasses, and two sets of handcuffs were scattered at a distance of up to 12 feet from where his body was found. Investigators later discovered pieces of glass on the hood of the patrol car that appeared to have come from his broken sunglasses. In the opinion of one expert witness, these circumstances were more consistent with a protracted struggle than with Rosenbalm's having fallen where he was shot. Otherwise, the relative position of the officer's body and of his vehicle were as described by the testimony of Nation and Daniels.

Overall, the crime scene was not well preserved. Local residents and officers from the Sheriff's department soon arrived in force. Investigators discovered that Rosenbalm himself was in possession of marihuana at the time of his death. Whether Rosenbalm was in unlawful possession of the marihuana is not, however, conclusively shown in the record. This circumstance led to considerable dissension among officers at the scene, finally resulting in the disappearance of certain evidence, including the marihuana found in Rosenbalm's patrol car, photographs of the vehicle's interior, and plaster casts taken of certain tire tracks in the area. Eventually, at least one captain from the Tarrant County Sheriff's Department, Johnny Prince, was indicted for alleged criminal activity in connection with these events. When called to testify at appellant's trial, Prince "took the Fifth."

Subsequent investigation of the case was largely inconclusive. Long after the killing, when appellant had become the focus of police investigation, Daniels took officers to an area where appellant had fired a number of shots from his .357 Magnum pistol about a year earlier. The officers recovered several slugs from a tree trunk. These bullets, however, were shown to have rifling marks different from those on the bullets taken from Rosenbalm's body.

However, because the rifling characteristics of a weapon are susceptible to some change with use, it is not certain that a different weapon was in fact used to kill Rosenbalm.

Finally, two expert divers trained in underwater investigation systematically searched Marina Lake for six hours each on two consecutive days in the area where, according to Daniels, appellant had thrown the murder weapon, but they were unable to find it.

■ Thus, the circumstantial and forensic evidence offered at trial not only failed to connect appellant with the killing of Rosenbalm, but also failed in nearly all material respects to confirm the testimony of Nation and Daniels. Accordingly, the jury's verdict convicting appellant for the capital murder of Rosenbalm, see V.T.C.A., Penal Code § 19.03(a)(1), depended almost exclusively on the credibility of the testimony of Nation and Daniels.

As previously stated, appellant asserts in his first point of error that the evidence the State presented at his trial was insufficient to support his conviction because the testimony of Nation was not corroborated. We disagree. Since Nation was also indicted for Rosenbalm's murder, he was an accomplice witness as a matter of law. Article 38.14, V.A.C.C.P., provides that

[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

We think it is clear from the evidence summarized above that Nations's testimony was sufficiently corroborated by the admissions that appellant made to his brother-in-law, Jimmy Daniels, who we find was not an accomplice to the murder of Rosenbalm, to sustain the jury's guilty verdict.

■ The law in this State is that a defendant's confession may be sufficient to corroborate an accomplice, so long as proof of the confession does not depend upon the testimony of the accomplice. In the present case, we find that it does not. See

*Mays v. State,* 726 S.W.2d 937, 942 (Tex.Cr. App.1986); *Ware v. State,* 475 S.W.2d 930, 932 (Tex.Cr.App.1972); and *Shaw v. State,* 89 Tex.Cr.R. 205, 229 S.W. 509, 512 (1921) (on original submission). We find that appellant's admission of guilt alone provided sufficient evidence to convict him, since admissions of guilt by the defendant need only be corroborated as to the *corpus delicti* of the crime. See *Self v. State,* 513 S.W.2d 832, 834 (Tex.Cr.App.1974). Also see *Streetman v. State,* 698 S.W.2d 132 (Tex.Cr.App.1985.) Here, the circumstances of Rosenbalm's demise left virtually no doubt that he met his end by a criminal agency.

■ We are not unmindful that Daniel's credibility was seriously undermined by the fact that he had previously testified under oath before the Grand Jury in a manner inconsistent with his trial testimony and, therefore, inconsistent with appellant's guilt. Consequently, his report of appellant's confession must have been viewed with considerable circumspection by the jury. Nevertheless, our analysis of evidentiary sufficiency is guided, as always, by the standard set out in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), wherein the United States Supreme Court cautioned that a reviewing court, "... faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." 443 U.S. at 326, 99 S.Ct. at 2793. This principle is true not only regarding the weight to be given evidence at trial, but also regarding the credibility of the witnesses. Sifting the truth in such matters is plainly the jury's province under our system of criminal justice.

The jury, as proved by its verdict, obviously believed beyond a reasonable doubt the testimony of Nation and Daniels, at least insofar as such testimony established appellant's culpability for the charged offense. Because this Court's own estimation of these witnesses' credibility forms no part of its evidentiary review, we decide

only whether such testimony was sufficient to convince a rational factfinder of appellant's guilt. Clearly, if believed, the testimony of Nation and Daniels was more than adequate for such purpose. Accordingly, appellant's first point of error is overruled.

■ In his fifth point of error, appellant asserts the evidence is insufficient to prove that Rosenbalm was in the lawful discharge of an official duty when killed. Appellant's contention is based on the fact marihuana was found in Rosenbalm's patrol car. V.T.C.A., Penal Code § 19.-03(a)(1), under which appellant was prosecuted, defines the offense of capital murder to include, not only the elements of murder set out in V.T.C.A., Penal Code § 19.-02(a)(1), but also that the accused "... murders a peace officer who is acting *in the lawful discharge of an official duty* and who the [accused] knows is a peace officer." (Our emphasis.)

We find from the evidence that a rational trier of fact could have found that Rosenbalm, while on duty, was evidently investigating a suspicious circumstance. He was in uniform and driving an official patrol vehicle with its overhead lights flashing. Under similar circumstances, we have held the evidence sufficient to support a rational inference that the officer was, indeed, discharging an official duty. See *Moreno v. State*, 721 S.W.2d 295, 301 (Tex.Cr.App. 1986). We reach the same conclusion here. The legality of the possession of the marihuana is irrelevant to such a determination under these facts. Appellant's fifth point of error is overruled.

In point of error number six, appellant contends the evidence was insufficient to sustain his conviction because Rosenbalm's name as proved in the trial was spelled other than how it was alleged in the indictment. In fact, however, the indictment alleges two different spellings of the name. The first spelling, "Clark *Rosenbalm*," occurs twice in the indictment, and the second

then appears in context as "the said Clark *Rosebalm*." [2] (Our emphasis.) The latter is so obviously a misspelling of the former that even appellant's counsel, as he argues that a variance exists between the pleading and the proof, marks "Rosebalm", but not "Rosenbalm", with a *sic* in his brief, which indicates to us that he realizes that the same person is meant in both instances.

■ Nevertheless, under settled case law, pronunciation rather than spelling is the key to resolving this issue. A variance between the allegation and proof of a name will not impugn the validity of a judgment of conviction so long as the names sound alike or the attentive ear finds difficulty distinguishing them when pronounced. *Flanagan v. State*, 620 S.W.2d 591, 597–598 (Tex.Cr.App.1981) (on rehearing). If a question arises whether two spellings are thus *idem sonans*, it is an issue of fact for the jury. Unless the two are patently incapable of being sounded alike, a failure to request submission of the issue for jury consideration will, therefore, defeat any claim of a variance on appeal. *Martin v. State*, 541 S.W.2d 605 (Tex.Cr.App.1976).

In the instant cause, because appellant failed to request a jury issue on the question of pronunciation, and because we are not convinced that the two names are incapable of being pronounced alike, the variant spelling is not fatal to appellant's conviction. Consequently, his sixth point of error is overruled.

In his eighth point of error, appellant maintains the evidence is insufficient to show that he acted "deliberately" within the meaning of Art. 37.071(b)(1), V.A.C.C.P., which provides that a person convicted of capital murder may not be sentenced to death unless the jury finds that "... the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable expectation that the death of the deceased or another would result[.]"

**2.** The indictment alleged in relevant part that appellant did:
"then and there intentionally and knowingly cause the death of an individual, Clark Rosenbalm Jr., by shooting the said Clark Rosen-

balm, Jr. with a firearm and the said Clark Rosebalm, Jr. was then and there a peace officer who was acting in the lawful discharge of an official duty and who the defendant knew was a peace officer[ ]"

The legislature has not defined the term "deliberately," and this Court has declined to do so as a matter of statutory construction. See, for example, *James v. State*, 772 S.W.2d 84, 102 n. 17 (Tex.Cr. App.1989). Thus, in assessing the sufficiency of evidence to prove a "deliberate" act, we are obliged to afford the jury a certain measure of latitude in its understanding of the term. So long as the evidence is adequate to show more than merely a "conscious objective to cause" death, V.T.C.A., Penal Code § 6.03(a), it will be sufficient for an affirmative answer to the first special issue if it shows that appellant's act was "deliberate" as that term is commonly understood. See *Rector v. State*, 738 S.W.2d 235, 244 (Tex.Cr.App. 1986), (held, because "deliberately" is to be understood in its usual acceptation in common language, it need not be defined in the jury charge); *Fearance v. State*, 620 S.W.2d 577, 584 (Tex.Cr.App.1981) (on rehearing), (held, "deliberately" means something different from "intentionally," at least in the sense that it means something more). For purposes of evidentiary review, we believe that the common understanding of the term "deliberately" in a capital murder context is "something more than intentional, ... [but] less than premeditation, ... [representing] a conscious decision—greater than mere will—to cause the death of the victim." *Nichols v. State*, 754 S.W.2d 185, 201 (Tex.Cr.App.1988). Therefore, it is against this standard that we determine whether the evidence is sufficient to establish deliberate conduct on part of the appellant.

Frequently, in a murder case, deliberation, or to act deliberately, is evidenced by some degree of planning to kill, as by lying in wait or by prior discussion of the crime. We have also held, however, the evidence sufficient for a finding that the murder was committed deliberately even when the murder occurred rather spontaneously, i.e., evidence will be held sufficient so long as it is established that the accused evinced a preparation to kill by arming himself in advance with a deadly weapon. E.g., *Carter v. State*, 717 S.W.2d 60, 66–68 (Tex.Cr.App.1986). In the instant cause, the fact that appellant, unlike Nation and Louder, did not attempt to drive away when Deputy Rosenbalm exited his patrol car, but instead waited for Rosenbalm to approach on foot before shooting him at point blank range, provides some basis for a rational conclusion that appellant made up his mind to kill Rosenbalm prior to the actual shooting. See also *Livingston v. State*, 739 S.W.2d 311, 339 (Tex. Cr.App.1987). At least, consistent with analogous case law, we are unwilling to hold that a jury could not rationally have thought so. Appellant's point of error number eight is overruled.

In his ninth point of error, appellant claims the evidence is insufficient to show "... a probability that [he] would commit criminal acts of violence that would constitute a continuing threat to society[,]" as required by Art. 37.071(b)(2), V.A.C.C.P. The record reflects that at the punishment phase of the trial, the State adduced evidence through the testimony of Bobby Davis, a former acquaintance of appellant's, that appellant once unlawfully shot a cow. Davis also testified that on another occasion, on the spur of the moment, appellant wantonly shot and killed a buffalo at the Lake Worth Wildlife Refuge. Davis further testified that he once witnessed appellant attack without justification or cause two young males. Appellant struck both victims a number of times with his fists even though neither were armed nor offered resistance. Davis stated that in spite of a plea for mercy from one of the young men, appellant beat that individual's knees with a hammer. Davis expanded his testimony to include another instance of violent conduct on appellant's part, when appellant became upset with a motorist whom he chased and repeatedly fired at with a rifle.

Jimmy Daniels, see *ante*, recounted events from the past several years showing appellant to be consistently aggressive in his dealings with others. These events included the savage beating of another individual when appellant was still a teenager, and a number of incidents in which appellant threatened his schoolmates with a

knife. Daniels also testified that appellant was a heavy user of methamphetamine, injecting it into his veins daily, and that he, appellant, derived his sole source of income from selling drugs to other individuals.

Daniels further described how he and appellant had chased another car and fired upon it because its driver had pulled sharply in front of appellant's truck. Evidently Daniels, on appellant's instructions, discharged three blasts from a shotgun into the rear of the other car while both vehicles were moving at a high rate of speed. Appellant also fired several shots at the other vehicle from his rifle, but failed to hit his moving target.

Daniels continued to reiterate appellant's violent behavior by describing two additional incidents. The first took place when appellant became upset with his brother's girlfriend because she had been in an argument with his brother. Appellant repeatedly fired at his brother's girlfriend with a shotgun after a car chase in which she wrecked her vehicle. Daniels was also present at the second incident when appellant fired "two or three" shots from a .44 Magnum pistol at the driver of another motor vehicle in response to the driver having "shot [him] the finger."

Aubrey Perkins, a juvenile probation officer in Montgomery County, testified that he and appellant were friends in high school. Perkins testified that in 1980 appellant held a knife to his, Perkins', throat for several minutes while questioning him about rumors of a sexual relationship between Perkins and appellant's girlfriend. He also testified that in August of 1982, on an occasion when Perkins was driving his brother to football practice, appellant drove alongside Perkins' vehicle and told him to "pull over," with the threat that if he did not, appellant would run his truck into Perkins' vehicle. Perkins complied but drove away quickly after seeing appellant slide toward the passenger side of his truck and stick his arm under the seat. Perkins managed to successfully evade appellant.

Elijah Elisher, who was then appellant's Tarrant County cellmate, testified that appellant, while in jail awaiting trial in this cause, threatened the lives of Jimmy Daniels, see *ante;* someone named "Jeff," for "messing around with his wife"; "a DA named Hinkley or something" probably for prosecuting him, and "some people named Rosenbalm," apparently referring to Rosenbalm's relatives. It appears to us that Elisher, having twice been incarcerated in the penitentiary and currently charged with three counts of aggravated assault on a jailer, must have seemed to appellant a likely hit man since, according to Elisher, appellant offered to make Elisher's bail and pay him $20,000 to kill all of the aforementioned individuals. The record does not reflect that anything occurred to effectuate appellant's murderous plan.

Unquestionably, if one believes the testimony of Daniels and Elisher, appellant is a young man much given to violence. While the record reflects that appellant has never before been convicted of a criminal offense, nor even arrested except as a juvenile, we find his penchant for the use of life-threatening weapons to resolve the least serious of his problems is alarming. So far as we can tell from a reading of this record, neither our juvenile nor our adult correctional systems in this State have yet been given an opportunity to reform appellant's criminal behavior. But, because we do not understand the legislature to require that the death penalty is reserved for only those individuals who have been adjudicated juvenile delinquents or have been incarcerated in our penitentiary as adults, we are constrained to find the evidence here sufficient for a finding that appellant would be a continuing threat to society. *Rougeau v. State,* 738 S.W.2d 651, 660 (Tex.Cr.App.1987).

Shocking circumstances of the offense itself, a casual attitude about killing, habitual use of illegal drugs, prior unadjudicated acts of violence against people and property have all been held by this Court to constitute evidence of future dangerousness. E.g., *Anderson v. State,* 717 S.W.2d 622, 633–634 (Tex.Cr.App.1986); *Santana v. State,* 714 S.W.2d 1, 8 (Tex.Cr.App.1986); and *Streetman,* 698 S.W.2d at 137. And all are, according to the testimony in this

case, characteristic of appellant's personality and behavior. Under circumstances such as these, we have not yet held the evidence insufficient for an affirmative answer to the second special issue, and decline to do so here. Appellant's ninth point of error is overruled.

In point of error number two, appellant contends that the trial judge committed reversible error in sustaining the State's challenge for cause to venireperson Janice Morrison Goodson. We excerpt portions of Goodson's *voir dire* examination to illustrate appellant's contention, beginning with questions propounded to Goodson by the prosecuting attorney.

Q. I notice an answer to your questionnaire that you were kind enough to fill out for us in response to the following question, with reference to the death penalty which of the following statements would best represent your feelings, circle one, and you circled No. 3 and with your signature on the next page or two pages later, I could never under any circumstances return a verdict which assessed the death penalty. Is that your opinion?

A. Yes, that's the way I feel.

Q. I beg your pardon?

A. That's the way I feel, yes.

Q. I presume then that you are opposed to capital punishment?

A. Yes I am.

Q. And I will repeat that question one more time and this is important for the record in this case. Could you, under any circumstances as a juror in a criminal case, vote to return the death penalty?

A. No.

At this juncture, the prosecutor challenged Goodson. Before the trial judge ruled, counsel for appellant was given the opportunity to then explain to Goodson the procedure under which the penalty phase of a capital murder case is conducted in Texas, including the manner in which the three special questions are submitted to the jury, and the legal consequences flowing from either affirmative or negative answers to these questions. After Goodson averred that she would not refuse to return a guilty verdict because of her opposition to capital punishment, the following exchange took place between her and defense counsel:

Q. All right. Does your feeling about the death penalty—and, you know, what the consequences of yes answers would be—Is your feeling about the death penalty such that you do not feel that you could fulfill the oath of office that you would have to take and answer those questions 1, 2, and/or 3, if 3 were to be given to you, that you could not answer those questions fairly and truly and honestly just as your oath requires you?

A. I can only tell you that I would do my best. That I would not deliberately do otherwise.

Apparently not content that these responses were dispositive, the trial judge called a conference with both attorneys in his chambers. After a time, they returned to the courtroom and resumed *voir dire* examination of Goodson, with appellant's counsel covering much the same ground as before. Suddenly, Goodson interposed:

A. You are asking me if I feel strongly enough about the death penalty that if I think he is guilty I am going to say, no, he is not guilty so he doesn't get the death penalty? You are asking me if I would do that?

Q. Yes, ma'am. That would be at the first stage, yes, ma'am.

A. I would not deliberately ...

Q. Just as you would not automatically vote guilty to keep somebody from getting the death penalty because that would be contrary to your oath, as I understood your earlier answer you wouldn't *automatically* vote *no* to these questions to keep somebody from getting the death penalty because that also would be contrary to your oath. Have I misstated your answer? If I have—

A. No, that's sound [sic] like what I said.

Still not content with Goodson's answers, the trial judge himself then recast the same

question and received the following answers.

Q. ... [The jury does] not assess punishment as it is done in other type cases, but they are asked to answer those three questions either yes or no, and I think you have surmised from talking to counsel for each side that if you vote yes to 1, 2 and/or 3 you will have voted to assess the death penalty. Now could you, in a proper case, if the facts warranted, do that?

A: I could. I wouldn't want to. I wouldn't want to, but I would.

THE COURT: Would it violate your conscience to vote yes in the proper case and the proper evidence.

A: Yes, it would.

Once again, the prosecutor challenged Goodson's ability to serve on the jury. And once again, counsel for appellant propounded questions to her for the purpose of determining whether, in spite of her opposition to the death penalty, she could render a verdict of guilty should the evidence warrant it. Goodson answered, just as she did consistently throughout her *voir dire* examination:

... I would not want to be in that position. I would hate very badly to be in that position, but I don't feel like I could do otherwise than what the law says I have to do.

Q. Would you follow the law? You wouldn't violate your oath of office?

A. I would not, no.

Q. By the same token, at the second stage you would not violate your oath and automatically vote one way or another? Here again, you would base your answers on the facts?

A. Yes, I will.

Still not satisfied, the prosecutor next took a somewhat more aggressive tack.

Q. Mrs. Goodson, really, we are down here about serious business and we'd just like to know what your opinion is and that's what I'm trying to find out.

A. I am willing to do what I can. I understand perfectly....

Q. Did you or did you not answer my question a while ago that you were opposed to capital punishment?

A. Yes, I am.

Q. Is that your final answer?

A. I feel like I have no choice. I mean, I am told that I have to come—yes, I am told that I have to come to this jury and I have to listen to the facts and if I listen to these facts then I have to personally say if I believe he is guilty or not. That's my responsibility....

Q. Nobody is telling you you have to do anything. That's the reason we have this legal system we have. Nobody is about to tell you to do anything.

A. If I am chosen, if I have to come to this jury then I don't have a choice.

Q. You certainly do have a choice. You get a vote.

A. I can say the man is guilty. Well, I believe there is other ways of dealing with that person being guilty than the death penalty.

Q. All right. Let me ask you this: In the State of Texas the law provides that in some cases for a jury to return a verdict of death that's our law, and there is a lot of laws that I don't agree with. And if you don't agree with this law, that's all we are asking you. If you will just tell us, you can go home.

A. Pardon me for saying so, but I have said so for several times that I don't agree with it.

At this point, the trial judge sustained the State's challenge for cause over appellant's objection. After Goodson left the courtroom, Bill Lane, one of appellant's defense attorneys, testified for the record as to Goodson's demeanor during her voir dire examination. Lane asserted Goodson did not break into tears, was fairly calm and collected, and gave quick responses to the questions posed to her.

Appellant avers this cause is very similar to *Roeder v. State*, 688 S.W.2d 856 (Tex.Cr. App.1985), wherein this Court reversed a capital murder conviction for the erroneous exclusion of a prospective juror upon the State's challenge for cause. See also *Pierson v. State*, 614 S.W.2d 102 (Tex.Cr.App.

1980). The prospective juror in *Roeder* stated that although the mandatory penalty of death would affect her deliberations, she could answer the special issues affirmatively if the State proved its case beyond a reasonable doubt. In reversing Roeder's conviction, this Court reaffirmed the principle that a prospective juror is not excludable for cause under *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), merely because the death penalty would affect or influence his or her deliberations. See also *Ex parte Hughes*, 728 S.W.2d 372 (Tex.Cr.App.1987).

 In ruling on this challenge for cause to a prospective juror, the trial judge must determine whether the prospective juror's views as to the death penalty would prevent or substantially impair his performance of his duties as a juror in accordance with the instructions given by the court and the oath taken by the juror. *DeBlanc v. State*, 799 S.W.2d 701, 717 (Tex.Cr.App.1990), and cases cited therein. See also *McGee v. State*, 774 S.W.2d 229, 235 (Tex.Cr.App.1989). There is no requirement that a prospective juror's bias or prejudice be proven with unmistakable clarity. *DeBlanc*, 799 S.W.2d at 717; *McGee*, 774 S.W.2d at 235, citing *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). This Court accords the trial judge's ruling in this regard great deference given that the trial judge's determination that a prospective juror would be prevented or substantially impaired from obeying his oath and following his instructions is based largely upon determinations of the venireperson's credibility and demeanor. *Fearance v. State*, 771 S.W.2d 486, 501–502 (Tex.Cr.App.1988); *Nichols v. State*, 754 S.W.2d 185, 195 (Tex.Cr.App. 1988). To determine whether the trial judge abused his discretion in granting the

State's challenge for cause to the prospective juror, we examine the prospective juror's testimony as a whole. *Fearance*, 771 S.W.2d at 500, and cases cited therein.

 In summarizing her voir dire examination, we find Goodson established, via her juror questionnaire form and later upon examination, that she could not impose the death penalty under any circumstances. She also stated that she would not "deliberately" find appellant "not guilty" because of her opposition to the death penalty. On the more critical issue of the three questions at punishment, Art. 37.071(b), however, Goodson vacillated. Pursuant to questioning by the State, defense counsel, and the trial judge, Goodson stated, among other things, she was opposed to capital punishment under any circumstances, that she could answer affirmatively the special issues if the facts warranted, but that it would violate her conscience to vote yes on the issues "in the proper case and the proper evidence". Goodson understood her responsibilities as a juror and said she would not violate her oath, but she also stated she did not agree with the law and if she were selected as a juror she would have no choice but to follow it.

 On the basis of these facts, we cannot say the trial judge abused his discretion in granting the State's challenge for cause to venireperson Goodson. When presented with a prospective juror who has conflicting feelings regarding the law, the juror's oath, and capital punishment, the trial judge is in a unique position to determine whether those same feelings would prevent or substantially impair the venireperson's performance as a juror. Accordingly, we defer to the trial judge's ruling in this instance, and overrule appellant's second point of error.[3]

---

**3.** The dissenting opinion asserts we approved Goodson's exclusion solely on account of her opposition to the death penalty. See dissenting opinion at p. 509. On the contrary, we recognized the affect that her feelings of opposition to capital punishment would have on her performance of her duties as a juror and deferred to the trial judge's implicit finding that Goodson's feelings would substantially impair such performance. We also recognized in the majority opinion that the mere fact that a prospective juror will be "influenced" by her feelings regarding the death penalty does not in and of itself make her challengeable for cause, nor does it constitute a "substantial impairment" of a juror's performance of her duties. Goodson's entire voir dire testimony evidences that her feelings regarding the death penalty went be-

Appellant raises another point of error complaining of the trial judge's ruling during voir dire. In his third point of error, appellant claims the trial judge reversibly erred in sustaining the State's challenge for cause to venireman Dow. Appellant concedes Dow initially gave disqualifying answers regarding his feelings toward capital punishment [4], but he argues his counsel subsequently rehabilitated Dow through his questioning. We excerpt relevant and exemplary portions of Dow's voir dire examination:

Q. (by the State) Can you imagine any set of circumstances under which you could return a verdict that would result in death?

A. I don't really know. There would always be a possibility where he might be innocent if you sent the man to the death penalty, so ...

After this initial exchange, the prosecutor went on to explain our capital murder sentencing scheme, specifically the special issues submitted under Art. 37.071(b)(1) and (2), and the voir dire continued with the State still questioning Dow.

Q. Do you think you could follow that law and answer yes to questions 1 and 2 up there knowing that a death sentence would result?

A. I don't know.

Q. Would you think about it for just a minute?

A. That's why I answered No. 3 [on the juror questionnaire form].

Q. Can you imagine any set of circumstances under which you would answer yes to both 1 and 2 there?

A. I don't really know.

Q. Would you try for me, please, just try to imagine a set of circumstances where you could answer number 1 and 2?

A. What do you mean by circumstances? Give me an example.

Q. I can't do that. Can you imagine any type of capital murder case—

A. Oh, if he was proven guilty?

Q. Yes, sir, after the second phase of the trial.

A. I just can't think of any thing right now.

Q. Knowing that both yes answers will leave this Judge no discretion except to sentence this Defendant to death?

A. I just can't think of any.

Q. You can't think of any whatsoever?

A. Not right now. Just if it involves me or, like, one of the members of my family but then I wouldn't be able to be on the jury, would I?

Q. That's correct.

A. And that would probably be the only thing I could think of right now. If somebody come (sic) in and killed all my kids and my wife and then I knew it was them—

Since venireman Dow had served on a civil jury, the trial judge then explained the procedure in a criminal trial by which the case is submitted to the jury. The trial judge then questioned the venireman:

Q. (by the Court) Now in a criminal case it's handled a little bit differently, substantially differently, in that we are going to have a trial on the charge of capital murder. Why did you mark No. 3 on your jury information sheet?

A. Like I said, there is always maybe a doubt.

Q. All right. Let me ask you this: Could you serve as a juror in a criminal case where capital punishment was not involved?

A. I possibly could.

Q. What I am asking you, is why you think that there would always be a doubt in a serious criminal case where there

---

yond merely influencing her in her deliberations at the guilt *and* punishment phases of trial. Moreover, the dissenting opinion faults the majority opinion for *not* relying on *Hernandez v. State*, 757 S.W.2d 744 (Tex.Cr.App.1988), in addressing this voir dire issue. We note only that *Hernandez* was a two judge plurality opinion and is of limited precedential value.

4. Like venireperson Goodson, see point of error number 2 *supra*, Dow indicated on his juror questionnaire form that he could never under any circumstances return a verdict which assessed the death penalty.

might not be a doubt in a regular criminal case?

A. Then you wouldn't be sentencing somebody to their death. This, you might just send somebody to prison and they could always get out.

Q. Okay. Let's first say you are chosen as juror in this case and you have heard the evidence and the twelve of you felt that the person was guilty of the charge. Could you vote a verdict of guilty knowing that at some point it might result in the death of the Defendant?

A. Well, you are wording it just like if I approve the death penalty.

Q. No, sir. I am not asking if you approve of the death penalty. I am saying if you heard the evidence and if you were convinced that the Defendant was guilty, could you vote for a verdict of guilty knowing that at some point this might result in the death of the Defendant?

A. No.

Q. Then it would affect your verdict?

A. Right.

The State challenged Dow for cause after this last answer.

Defense counsel then began questioning Dow. Counsel explained extensively the special issue procedure in capital cases and how that procedure differs from civil trial procedure. Dow acknowledged in either case a juror bases his verdict on the evidence rather than the outcome of the answers to special issues and agreed that the juror's oath required as much. The examination continued:

Q. (by defense counsel) Okay. Now here is the situation. We have got to know from you whether or not you think you are the sort of person who could answer these questions at the first stage or the second stage based solely upon the evidence or whether you had kind of closed you mind and said, no, I don't care what the facts are, I am going to do such-and-such. I am going to answer this certain way.

A. I think that's what it was. The question I answered, the third one [on the juror questionnaire form]. It more or less was probably my conviction.

Q. All right. But regardless of what the evidence is you wouldn't pay attention to the evidence, you would just answer the questions a certain way regardless of what evidence is presented? Is that the way you feel?

A. I don't know. See, I have never got (sic) into it.

\* \* \* \* \* \*

Q. ... I suppose what it boils down to is we have got to ask you this: Would you, not knowing what the facts are going to be in this case and not knowing how this trial is going to unfold or what the evidence is going to be, would you keep an open mind until you heard the evidence before you decided how you would vote, guilty or not guilty?

A. Yes. I would keep an open mind.

Defense counsel continued in this vein and established Dow would not pre-judge this case. Apparently exasperated by the questioning from all parties, Dow asked "why so much hinges on that one particular question [on the juror information form]". Defense counsel explained the severity of the possible penalty upon conviction and concluded his voir dire examination as follows:

Q. Do you think, given your attitude, give the openmindness (sic) and the fairness that you want to have that you could follow the law and base your decision upon the evidence?

A. True.

Q. All right. That's what your oath requires you to do.

A. Right.

\* \* \* \* \* \*

Q. You certainly can't pre-judge the case because you haven't heard the evidence. The most you can do is keep an open mind, listen to the State's case and let the chips fall where they may; do you agree with that?

A. True.

Defense counsel submitted the prospective juror as qualified, but the trial judge granted the State's challenge.

In this point of error appellant relies on the same cases cited in the second point of error to support his contention that the trial court erred in excusing venireman Dow. Although Dow agreed with defense counsel that it would be unfair for him to come into this case with the preconceived idea that the defendant was guilty and deserved the death penalty, or, on the contrary, that it would be improper for him to disregard the evidence and his oath as a juror, we do not find this questioning rehabilitated Dow's previous "disqualifying answers". We have excerpted Dow's voir dire testimony at length because it clearly shows that his feelings regarding capital punishment would substantially impair, if not totally prevent, his performance of his duties as a juror. We hold the trial judge did not abuse his discretion in granting the State's challenge for cause. Point of error number three is overruled.

In his fourth point of error, appellant contends the trial court erred in overruling his motions for continuance. As we previously noted in the discussion of the facts, see *supra* at p. 4, Officer Johnny Prince was indicted on February 28, 1986, for alleged criminal activity in connection with the investigation of this offense. Prince was indicted for perjury, Penal Code § 37.-02, and tampering with or fabricating physical evidence, Penal Code § 37.09.[5] On the basis of these circumstances, appellant filed, on February 24, 1986, a motion for mistrial and his first motion for continuance, incorporating therein the grounds raised in the motion for mistrial, and further alleging *inter alia* Prince would invoke his Fifth Amendment privilege against self-incrimination if called to testify during trial and asking for a continuance until such time as the grand jury completed its investigation and counsel received all information relating to the nature and extent of Prince's alleged criminal behavior. On March 5, 1986, appellant filed another motion for continuance, with copies of Prince's indictments attached, asserting that Prince's acts were illegal and exculpatory[6], and as such were material to his defense, and that Prince would invoke his right against self-incrimination if called to testify at trial.[7] Appellant requested the continuance until such time that he could adequately investigate this "newly discovered evidence", prepare his defense, and ensure him the benefit of his constitutional rights. After a brief hearing held March 6, 1986, wherein appellant also specifically requested a copy of the transcription of the grand jury testimony, the trial judge overruled the motion for continuance finding that defense counsel had known the parties involved in this alleged offense for some time, that no new evidence had surfaced except for whether Prince did or did not conceal evidence of marihuana in the victim's possession and that counsel already had an investigator working on that issue, and that voir dire would take a substantial amount of time (implying that defense counsel had ample time to investigate Prince's alleged criminal activity). The trial judge withheld ruling on the motion for mistrial pending voir dire.

Appellant contends in his brief that the trial court erred in denying his requested continuance until such time "as the crime scene officer's pending indictments for perjury and official misconduct for fabricating evidence were resolved."[8] Appellant ar-

---

5. The perjury charge related to an affidavit which Prince made on January 21, 1986, stating he had found a baggie of marihuana in the victim's coat which he "flushed". This affidavit was admitted into evidence at trial and read to the jury. Prince later recanted this statement, according to witness Celeste Rogers, an investigator for the Tarrant County District Attorney's Office, who testified at trial that on February 21, 1986, in the district attorney's office, Prince produced the baggie of marihuana which he had previously stated he flushed. The second charge against Prince arose out of this incident.

6. See discussion of point of error number five.

7. Prince was called as a witness by the defense, and he did in fact refuse to testify by invoking his Fifth Amendment right against self-incrimination.

8. The State argues appellant has failed to preserve this point of error for review because his contention on appeal (that the cause be continued until the resolution of the indictments against Prince) differs from the contention raised in the motions for continuance (that the cause be continued until defense counsel had an

gues Prince's testimony was exculpatory in that it went to the "very heart of the portion of the indictment elevating plain murder to capital murder" because it showed the victim was not acting in lawful discharge of an official duty because he was in possession of marihuana at the time of his death. (See discussion *supra* in point of error number five where we overruled this same contention in the context of a challenge to the sufficiency of the evidence.) The State counters the trial judge did not abuse his discretion in denying appellant's motions for continuance because this same evidence was admitted before the jury through Prince's affidavit and Celeste Rogers' testimony regarding his recantation, and appellant has failed to show this evidence was material to his case and that he was prejudiced by the inability to produce it.

▆▆ After reviewing the record and the trial judge's ruling on the motion, we agree with the State's contention. As we noted in our discussion of appellant's fifth point of error, the evidence of the victim's marihuana possession did not preclude appellant from committing capital murder and was, therefore, not exculpatory. Also, although Prince claimed the Fifth Amendment when called to the witness stand, evidence regarding the victim's possession of the marihuana nevertheless came to light, as did Prince's alleged cover up of this information. Thus, we find appellant was not prejudiced by the failure of the trial court to grant his motions for continuance and accordingly hold, on these facts, that the trial judge did not abuse his discretion in denying appellant's motions for continuance. Appellant's fourth point of error is overruled.

▆▆ In the seventh point of error, appellant asserts the indictment in this cause was fundamentally defective for failure to allege the crime of capital murder. Specifically, appellant argues capital murder is not alleged because the person named in the first portion of the indictment, alleging murder under Penal Code § 19.02(a)(1), is "Rosenbalm", whereas the person named in the aggravating portion of the indictment is "Rosebalm". See footnote 1, *supra*. Appellant reurges the same argument and legal authorities which he advanced in his sixth point of error, *supra* at pp. 496–497. In the sixth point of error we held the variant spelling was not fatal to appellant's conviction in that we were not "convinced that the names of Rosenbalm and Rosebalm are incapable of being pronounced alike." *Supra* at p. 497. Although the victim's surname is misspelled the third time it is used in the indictment, the misspelling does not cause the indictment to fail to allege an element of the offense of capital murder under Penal Code § 19.03(a)(1). Thus, we overrule appellant's seventh point of error.

▆▆ In his tenth point of error, appellant contends the trial court reversibly erred by refusing to give the jury a definition of the term "deliberately" as used in the first punishment issue. Art. 37.-071(b)(1). Appellant not only objected to the lack of any such instruction in the jury charge, which was overruled, but also requested a specific instruction, which was denied. He submits that the term "deliberately" has now acquired a technical or particular meaning within the context of special issue one and that V.T.C.A. Govt.Code § 311.011(b) requires the trial court to define the term.[9] This Court has repeatedly held that, because the term "deliberately" is not defined by statute, the term is to be understood in light of common usage and, therefore, need not be defined in the jury

opportunity to investigate the facts of Prince's alleged misconduct). Although we are inclined to find waiver in this instance, we do not because in his appellate argument appellant contends Prince would have no legitimate right against self-incrimination once the indictments against him had been resolved, and appellant raised the Fifth Amendment in each motion for continuance. Given the severity of the sentence assessed in this case, we are hesitant to find waiver.

9. Subsection (b) of § 311.011, Common and Technical Usage of Words, provides:
 Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.

charge on punishment. *Madden v. State,* 799 S.W.2d 683 (Tex.Cr.App.1990), citing *Purtell v. State,* 761 S.W.2d 360 (Tex.Cr. App.1988), *cert. denied,* 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989). Appellant's tenth point of error is overruled.

Appellant avers in his eleventh point of error that the trial court committed reversible error in its application paragraph of the jury charge. Appellant argues the trial judge erred by failing to apply the accomplice instruction to the "elevating" element of this capital murder offense, *viz,* that the victim was a peace officer acting in the lawful discharge of an official duty and appellant knew he was a peace officer. Appellant objected to the failure of the charge to include this instruction in the application paragraph, and the objection was overruled. Appellant then, pursuant to Art. 36.15, V.A.C.C.P., submitted a requested charge including such instruction, which was denied. The jury charge on accomplice witness testimony thus stated:

> You are instructed that an accomplice, as the term is hereinafter used, means any person connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime, as such parties, by unlawful act or omission on their part transpiring either before or during the time of the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Mere presence alone, however, will not constitute one a party to an offense.

> The witness, Vance Nation, is an accomplice, if an offense was committed, and you cannot convict the defendant upon his testimony unless you first believe that this testimony is true and shows that the defendant is guilty as charged, and then you cannot convict the defendant upon said testimony unless

you further believe that there is other testimony in the case, outside of the evidence of the said Vance Nation tending to connect the defendant with the offense committed, if you find that an offense was committed, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission, and then from all of the evidence you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

Appellant recognizes in his brief that this point of error is meritless in light of the present state of the law. In *Holladay v. State,* 709 S.W.2d 194 (Tex.Cr.App.1986), the issue confronting this Court was "just how detailed an instruction in a capital murder case, where the State relies upon the testimony of an accomplice witness to establish its case against the accused, must be given the jury in order to satisfy the provisions of Art. 38.14, [V.A.C.C.P.][10] *Id.* at 196. This Court held the trial judge did not err in refusing to expressly require corroboration of the alleged aggravating element as well as the alleged murder in the jury instruction. See also *May v. State,* 738 S.W.2d 261, 266 (Tex.Cr.App. 1987), and *Anderson v. State,* 717 S.W.2d 622, 631 (Tex.Cr.App.1986). In so holding, this Court expressly overruled two prior cases, *County v. State,* 668 S.W.2d 708 (Tex.Cr.App.1984), and *Fortenberry v. State,* 579 S.W.2d 482 (Tex.Cr.App.1979), which held that if a conviction for a capital murder offense may be based upon testimony of an accomplice witness, and the defendant requests an instruction that the witness' testimony must be corroborated as to the specific elements that make the crime of murder capital murder, the trial judge is required to give the instruction. See *Holladay,* 709 S.W.2d at 195. The Court noted in *Holladay* that the particular flaw in *Fortenberry,* which was reaffirmed in *County,* was that the Court engrafted

---

10. Article 38.14 provides:
 A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defen-
 dant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

onto the capital murder statute a requirement that the statute did not require, to-wit: corroboration of the aggravating element. *Holladay*, 709 S.W.2d at 201. Appellant now urges this Court to overrule *Holladay* and again adopt the reasoning in *County* and *Fortenberry*, which we refuse to do since our capital murder scheme still does not require such corroboration.

We find, as the Court did in *Holladay*, that the jury instruction on accomplice witness testimony satisfies the requirements of Art. 38.14. The instruction made clear that the jury had to find (1) that the offense itself had been committed, (2) that the accomplice witness Nation's testimony was truthful, (3) that Nation's testimony showed appellant was guilty as charged, (4) that there was other testimony in the case, outside Nation's testimony, that tended to connect appellant with the offense committed, and (5) that, *from all the evidence,* appellant was guilty of the offense charged beyond a reasonable doubt. Comparable instructions were held legally sufficient in *Holladay*, 709 S.W.2d at 202. Appellant's eleventh point of error is overruled.

In his twelfth point of error, appellant contends the trial court reversibly erred by allowing Elija Elisher to testify during the punishment phase of trial. Elisher and appellant were inmates in the same cell block in the Tarrant County Jail while appellant was awaiting trial. Elisher testified, over objection, that at the request of appellant he unsuccessfully attempted to procure someone to kill several persons.[11] Appellant contends this testimony by an alleged accomplice was inadmissible because it concerns unadjudicated attempted offenses which were not corroborated. Appellant notes Art. 37.071, V.A.C.C.P., does not expressly permit or prohibit admission of testimony of an accomplice concerning unadjudicated offenses [12], but asserts the "same basic policies of fairness" underlying Art. 38.14, see footnote 8 *supra* at pp. 504, apply to the punishment phase of a capital murder trial. Appellant submits admission of Elisher's testimony violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and Art. 1, § 19, of the Texas Constitution.

This Court previously addressed this issue in *Thompson v. State*, 691 S.W.2d 627 (Tex.Cr.App.1984), which stated:

> ... It is well settled that evidence of unadjudicated extraneous offenses is admissible at the punishment stage of a capital murder trial. [citations omitted] It is also settled that the corroboration requirements of Art. 38.14, supra, are inapplicable to the testimony of accomplice witnesses as to extraneous offenses, at the punishment stage of a capital murder trial. [citation omitted]

*Thompson*, 691 S.W.2d at 633. The Court also noted the accomplice witness rule of Art. 38.14 is not constitutionally mandated, and therefore, it is incumbent upon the legislature, not the courts, to expand or restrict its scope. The Court found no error in the trial judge's admission at punishment of uncorroborated accomplice testimony as to extraneous offenses committed by the appellant. *Id.* at 633–634. On the basis of *Thompson*, we hold the trial judge did not err in allowing Elisher to testify regarding these unadjudicated offenses. Appellant's twelfth point of error is overruled.

Finding no merit in appellant's points of error, we accordingly affirm the trial court's judgment.

BERCHELMANN and STURNS, JJ., not participating.

---

11. Elisher stated appellant wanted someone to kill a witness against him, a man allegedly having an affair with his wife, members of the victim's family, and members of the district attorney's office. See also discussion at pp. 498 *supra.*

12. Article 37.071(a) provides in pertinent part:

> ... In the [punishment] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas ...

TEAGUE, Judge, dissenting.

Appellant's second point of error calls for a fairly straightforward application of the principles enunciated in *Hernandez v. State*, 757 S.W.2d 744 (Tex.Cr.App.1988). Veniremember Janice Morrison Goodson indicated that she was categorically opposed to the death penalty and would under no circumstances vote to impose it. No effort was made by defense counsel to determine whether her views might be affected by the hypothetical facts of an especially gruesome, senseless, or shocking murder. Yet Goodson insisted throughout *voir dire* examination that she would honestly answer questions of fact relating to deliberateness and future dangerousness, all to the best of her ability. The prosecutor made no attempt to determine whether her opposition to capital punishment would prevent or substantially impair her ability fairly and accurately to decide the special issues of fact which are entrusted to the judgment of jurors at the second phase of a capital murder trial, and the trial judge made no such finding.

This case thus provides graphic illustration of two radically different viewpoints concerning the qualification of venirepersons for service on a capital jury in Texas. The prosecutor in this cause evidently believed that an inability to impose the death penalty under any circumstances automatically subjects a venireperson to a challenge for cause. The defense attorney, on the other hand, maintained that such opposition disqualifies a potential juror only when such person is thereby rendered unable to decide or is substantially impaired in his ability honestly to decide critical questions of fact. For the reasons elaborated at length in *Hernandez*, the second view is a correct understanding of the law.

The majority's failure to apply this law in even-handed fashion holds for naught one of the soundest and most enduring rules of jury selection in this State—that a veniremember's personal view of the law is immaterial so long as he is willing and able during his official deliberations as a juror conscientiously to apply the law imparted by the court's instructions. Indeed, in *Sat-tiewhite v. State*, 786 S.W.2d 271, 279–281 (Tex.Cr.App.1989), this Court even held that a prospective juror who discerns no difference between the terms "deliberate" and "intentional" is nevertheless qualified for jury service in spite of what would otherwise be a challengeable viewpoint so long as he affirms during *voir dire* that he will "follow the law." Yet veniremember Goodson, who affirmed precisely the same thing in the instant cause, is thought by the Court to be vacillating. This simply will not do.

As in other contexts, a citizen's personal support for or opposition to the law ultimately has very little to do with his qualifications for jury service. If put to a popular vote, I daresay that a significant part of the population would favor the repeal or amendment of many statutes. Yet these people are not thereby disqualified from jury service. Thus, even if a state senator or representative actually voted in the legislature to eliminate the defense of insanity, for example, we would not hold him automatically challengeable for cause in any criminal trial where the defense of insanity might be raised. Only if his personal views were such that he could not or would not fairly apply the law of insanity to the case at hand would a challenge to his service on this ground properly be sustained.

This Court has evidently lost sight of the fact that these principles apply with equal force to a veniremember's personal view of the death penalty. One might have expected that a fair reading of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), to say nothing of *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) and *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), would convince even a casual student of constitutional law that opponents of capital punishment are not automatically excludable from capital juries. But the lesson has not been learned even by the judges of Texas's highest court. And the message which they now send to the trial courts of this State is that anyone who personally opposes the death penalty may with complete impunity be barred from jury service in any capital case upon request of the prosecuting attorney.

I say "anyone" because the majority admits that Goodson "consistently" affirmed that she would follow the law in spite of her opposition to capital punishment and that she would give honest answers to the statutory questions submitted for her consideration at the punishment phase of trial. The majority admits that "Goodson understood her responsibilities as a juror and said she would not violate her oath[.]" The majority also acknowledges that in spite of her disagreement with the law Goodson repeatedly averred that "if she were selected as a juror she would have no choice but to follow it." The Court never so much as intimates that Goodson ever gave an answer from which any contrary inference could be drawn. In short, the majority approves her exclusion from jury service on account of her opposition to the death penalty, and for no other reason. Doing so is contrary to the United States Constitution and to Texas law as I understand it. Moreover, the error cannot be harmless beyond reasonable doubt. *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). *Also cf. Harris v. State*, 790 S.W.2d 568 (Tex.Cr.App.1990).

Because it is the burden of the party moving for exclusion to produce evidence of substantial impairment, and because the record in this cause contains no evidence from which it might be inferred that Goodson was at all impaired in her ability to decide material questions of fact, it was error to sustain the State's challenge for cause against her.

It should be noted that the trial judge, in excluding Goodson, caused the record to reflect that he relied upon her demeanor during *voir dire*. He did not, however, specify in the record the circumstances surrounding her demeanor which moved him to conclude that she was excludable for cause. The prudent defense attorney later produced testimony indicating that Goodson's demeanor was calm, collected, and attentive throughout questioning. As we noted in *Hernandez*, the demeanor of a prospective juror should form a significant part of this Court's appellate review only when the record itself discloses ambivalence, equivocation, or vacillation by the venireperson in question, or when the evidence is ambiguous or conflicting on the

issue of such venireperson's qualifications for jury service. None of these circumstances are reflected by the record in this cause, and the Court therefore errs in deferring to the trial judge's observation of Goodman's demeanor as justification for sustaining the State's challenge for cause.

Students of this Court, if any remain after its years of abject inconsistency, will no doubt be amazed that the majority opinion in this case so fully sets forth the *voir dire* examination of Goodson before approving her exclusion. There is unambiguously revealed a woman who manages to keep in balance both personal conscience and public responsibility. And there is also revealed a number of lawyers on and off the bench who, perhaps because of this Court's past folly, have evidently lost sight of the real world. Their myopia is best illustrated by the final colloquy between Goodson and the prosecutor immediately before she was excused.

"[I]f you don't agree with this law," the prosecutor moaned in frustration, "that's all we are asking you. If you will just tell us, you can go home."

"Pardon me for saying so," Goodson replied with uncommon patience, "but I have said so for several times that I don't agree with it."

So the trial judge let her go home. He did it because she didn't "agree with this law" that murderers should sometimes be put to death. He did it even though he had no reason to suppose that she would not give him honest answers to the special issues if called upon to do so. He did it in spite of her unconditional promise to follow the law. He did it only because she was personally opposed to the death penalty. And this Court, in violation of the United States Constitution, here holds that it was within his discretion to do so.

I dissent.

CLINTON, J., joins in dissent of TEAGUE, J.