ACCEPTED
13-14-00537-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/24/2015 5:08:33 PM
CECILE FOY GSANGER
CLERK

No. 13-14-00537-CR

IN THE

THIRTEENTH COURT OF APPEALS

at Corpus Christi

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/24/2015 5:08:33 PM
CECILE FOY GSANGER
Clerk

_____

ALLEN RAY INCE,

Appellant,

v.

THE STATE OF TEXAS

Appellee

_____

Appealed from the
36th Judicial District Court of Aransas County, Texas

_____

STATE'S AMENDED BRIEF

_____

Michael E. Welborn
District Attorney

Marcelino Rodriguez
Assistant District Attorney
Texas Bar No. 00797336
P.O. Box 1393
Sinton, Texas 78387
Tel.    (361) 364-9390
Fax     (361) 364-9490

ATTORNEY FOR APPELLEE,
THE STATE OF TEXAS

ORAL ARGUMENT NOT REQUESTED

1

# TABLE OF CONTENTS

INDEX OF AUTHORITIES............................................................................3

STATEMENT OF FACTS..........................................................................5

APPELLEE'S REPLY TO APPELLANT'S GROUNDS FOR REVIEW.........................4

SUMMARY OF ARGUMENT.....................................................................22

ARGUMENT.........................................................................................22

PRAYER...............................................................................................39

CERTIFICATE OF SERVICE....................................................................40

# INDEX OF AUTHORITIES

## CASES

*Blankenship v. State*, 780 S.W.2d 198 (Tex.Crim.App. 1988)..........................................23

*Booker v. State*, 929 S.W.2d 57 (Tex.App.– Beaumont 1996)............................................23

*Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App. 1996..........................................33,34,35

*Denman v. State*, 193 S.W.3d 129 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd).......33

*Dyson v. State*, 672 S.W.2d 460 (Tex. Crim. App. 1984)....................................................24

*Farris v. State*, 819 S.W.2d 490 (Tex.Crim.App. 1990).....................................................23

*Griffin v. State*, 614 S.W.2d 155 (Tex.Crim.App. [Panel Op.] 1981)...............................23

*Houston v. State*, 663 S.W.2d 455 (Tex.Crim.App. 1984)..................................................23

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 650 (1979)......................22

*Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App. 2000)........................................................36

*Taylor v. State*, 921 S.W.2d 740 (Tex.App.– El Paso 1996).............................................34

*Saxton v. State*, 804 S.W.2d 910 (Tex. Crim. App. 1991)............................................25,33

## STATUES

*TEX. PENAL CODE ANN.* § 2.04(d) (Vernon 2003)......................................................25,33

*TEX. PENAL CODE ANN.* § 9.31(a) (Vernon Supp. 2009)...............................................23

APPELLEE'S REPLY

Reply to Appellant's **ISSUES RAISED ON APPEAL**:

**Issue #1:** The evidence produced at trial is legally sufficient to support the appellant's conviction for aggravated assault.

**Issue #2:** The evidence produced at trial is factually sufficient to support the appellant's conviction for aggravated assault.

STATEMENT OF FACTS

Testimony on the jury trial started on July 22, 2014. [Volume 3, Reporter's Record, page 1] the State called sixteen year old Virginia Gonzales. Ms. Gonzales testified that on December the 11th, 2011 she was at the Bay Wash Laundry Mat located in Rockport, Texas in Aransas County. Virginia Gonzales was there with her fourteen year old sister Aurora Gonzales, her eleven year old brother, her cousin Megan Padilla, and her friend Sarah Reyes. Virginia Gonzales stated that they were also accompanied by their mother's boyfriend Artavias Edwards whom they referred to as Trey and they arrived at the laundry mat in her mother's car which was driven by Mr. Edwards [Volume 3, Reporter's Record, page 17-19]

Virginia Gonzales stated that when they arrived at the laundry mat on that afternoon the appellant, Mr. Allen Ray Ince was already there. She further stated that everything was fine when they first got there and were washing their clothes. However, when she was taking the clothes out of the washer to put them into the dryer, she had to jump a little to get the clothes out of the bottom and as she was doing that, she noticed the appellant Mr. Ince staring at her and his stare gave her uneasy feeling. Virginia Gonzales also stated that the appellant then kept asking her if she had an ID or a driver's license so she could take him to get beer. She responded by telling the appellant that she was only thirteen years old and could not drive or buy beer. Virginia Gonzales stated that the appellant responded by saying "okay" but he still kept on asking several times and she kept giving him the same answer. Virginia Gonzales stated that she did not know the appellant but had seen him at the laundry mat once about a week before. [Volume 3,

5

Reporter's Record, page 20] She then went outside and told her Artavias Edwards, who was outside smoking a cigarette, that a guy indicating the appellant -- because she didn't know the appellant's name -- kept staring at her and he was making her feel uncomfortable and he kept asking her if she could drive him to get beer and "stuff like that." Virginia Gonzales then stated that after she told Mr. Edwards about what was going on, he said don't worry about it, that if he says anything again to let him know. She then went back inside and while she and her sister were putting the clothes to dry, the appellant started asking her the same questions again. [Volume 3, Reporter's Record, page 19-20] Virginia Gonzales decided to go outside and tell Mr. Edwards who then stated to her "all right" and after putting out his cigarette, he calmly walked inside and went to speak with the appellant Mr. Ince. [Volume 3, Reporter's Record, page 21-22]

Ms. Virginia Gonzales stated that Mr. Edwards did not yell or cuss at the appellant while he was speaking with him. Virginia Gonzales noted that the appellant did not seem to be upset or excited as he and Mr. Edwards spoke. Mr. Edwards talk with the appellant did stop the appellant from speaking with Virginia Gonzales, in fact the appellant continued to speak with Virginia Gonzales in front of Mr. Edwards. Mr. Edwards got mad and said that they could take it outside and take care of it like real men and walked outside. The appellant, Mr. Ince followed Mr. Edwards out a short time later.[Volume 3, Reporter's Record, page 23-24] Virginia Gonzales stated that after Mr. Edwards and the appellant had left the building she turned her back to continue the washing, when she turned back around she saw through the glass Mr. Edwards punch at the appellant and then she saw the appellant hit back and they stepped down, and then she saw Mr.

6

Edwards and the appellant punching at each other while standing next to her mother's car. Virginia Gonzales stated that she observed all this while she was still in the building. She stated that she didn't come out of the building until her sister came and told her that the appellant had a knife. [Volume 3, Reporter's Record, page 23-24]

Virginia Gonzales stated that when she got outside the fight had moved to the street and she was looking for the knife. She stated that she then saw the appellant swinging at Mr. Edwards and Mr. Edwards was backing away from the appellant she saw the knife in the appellant's hand. [Volume 3, Reporter's Record, page 24-25] Virginia Gonzales then stated started screaming, telling Mr. Edwards to move because the appellant had a knife. When Virginia Gonzales saw that the appellant had dropped the knife on the ground, she attempted to stop the fight by getting between the appellant and Mr. Edwards and attempted to kick the knife away from the appellant. However, the appellant managed to grab the knife again and attempted to cut Virginia Gonzales' ankle but failed because Mr. Edwards pushed her out of the way. She then ran back toward the car and called the police. [Volume 3, Reporter's Record, page 25-26] While at the car she looked back and saw the appellant just swinging knife at Mr. Edwards but she could not tell whether or not the appellant had stabbed Mr. Edwards. Virginia Gonzales saw Mr. Edwards running backwards while the appellant was going forward chasing him as they went going back and forth. Virginia Gonzales stated that Mr. Edwards was not armed. [Volume 3, Reporter's Record, page 26] She also stated that she saw Mr. Edwards had continued to run away from the appellant but the appellant kept running after him.[Volume 3, Reporter's Record, page 27] She stated that when the police got there

7

they drew their weapons and repeatedly told the appellant to drop the knife. The appellant did not immediately comply with the order but eventually he did drop it.[Volume 3, Reporter's Record, page 27-28]

Virginia Gonzales stated that she was familiar with the injuries that the appellant had inflicted on Mr. Edwards. After she examined photographs she described that the photographs she was shown depicted the injuries that Mr. Edwards had received during the assault, such as a stab wound on the back of Mr. Edwards arm between his shoulder and bicep, a stab wound on the inside of his left arm, and a stab wound to Mr. Edwards' chest. Ms. Virginia Gonzales stated that Mr. Edwards taken to the hospital and remained there for about a month.[Volume 3, Reporter's Record, page 30-32]

Ms. Gonzales testified that the entire time she was at the scene of the assault, she never heard Mr. Edwards ever threaten the appellant. Ms. Gonzales further testified that Mr. Edwards was did not possess any weapons nor was there a gun or any type of weapon in her mother's car.[Volume 3, Reporter's Record, page 28, 32-33]

The next witness called by the State was Aurora Gonzales who is the sister of Virginia Gonzales. Aurora Gonzales stated that she was with her sister, her best friend Sarah, her cousin Megan, and Mr. Edwards at the Bay Wash Laundry Mat on December the 11th, 2011. She testified that it was after they had arrived at laundry mat, that the appellant Allen Ray Ince began talking to her sister Virginia Gonzales. She stated that she did not know the appellant but she had seen him there at the laundry mat once and that was the week before.[Volume 3, Reporter's Record, page 53-54] Aurora Gonzales stated that neither her nor her sister initiated the conversation with the appellant Mr. Ince.

The appellant came over to them and asked her sister Virginia if she had an ID or driver's license to take him to go get beer. Aurora Gonzales stated that the appellant was bothering her sister because he was kept talking to her and looking at her in such a way that it made her feel weird and uncomfortable."[Volume 3, Reporter's Record, page 55-56]

Aurora Gonzales then testified that Virginia went to go get Mr. Edwards. When Mr. Edwards came in he started talking to the appellant. She stated that they weren't arguing, they were talking in a low voice and then Mr. Edwards told him to stop talking to her sister but the appellant did not stop talking to her. At this point Mr. Edwards asked the appellant to step outside. [Volume 3, Reporter's Record, page 56-57] Aurora Gonzales stated that Mr. Edwards left the washeteria and took off his shirt and his shoes like he was going to fight. She went back to doing the laundry and when she turned back she saw the appellant walking outside. She stated that she saw the appellant walked outside he walked up to Mr. Edwards and then that's when Mr. Edwards pushed the appellant away. She then saw the appellant hit Mr. Edwards in the face. She further stated that she saw the appellant stab Mr. Edwards as Mr. Edwards was backing away from him.

On cross examination Aurora Gonzales stated that, " Like, Mr. Ince would step forward and Mr. Edwards pushed him back and Mr. Ince came back with a hit and then that's when Mr. Edwards came back behind the car and then here comes Mr. Ince with a knife and that's when the stab..... that's when I first seen the knife." [Volume 3, Reporter's Record, page 70] She explained that it was after this push and this hit that

9

she saw he knife and blood on Mr. Edwards' body.[Volume 3, Reporter's Record, page 70] Aurora Gonzales further explained that the first stab was on Mr. Edwards' chest right here by his heart. She saw that Mr. Edwards had pushed the appellant away and the appellant then comes back and hits Mr. Edwards. She further stated that she saw Mr. Edwards back away behind the car and then the appellant with a knife comes at Mr. Edwards and stabs Mr. Edwards as he was backing away from the appellant. [Volume 3, Reporter's Record, page 70-71] After Mr. Edwards was stabbed he takes off running into the street and Mr. Ince followed him stabbing and cutting him about three or four times. Aurora Gonzales said that Mr. Edwards was not hitting at the appellant, "Mr. Edwards, like, he didn't -- he wasn't hitting back but like Mr. Edwards was like, his hands were like down by his side because of -- if you're getting stabbed of course you're not going to hit because it's just going to make him stab you more so Tray was just like walking backwards and that's when Mr. Ince was just following his movement everywhere he went."[Volume 3, Reporter's Record, page 73-74] When asked by defense counsel if she thought if Mr. Edwards was he running away trying to escape or was he not trying to escape. Aurora Gonzales responded, "Like, he was trying to move, he was trying to -- don't know if he was getting away because I'm not him. I don't know if he was trying to get away. He was just trying to get him [appellant] away from us." [Volume 3, Reporter's Record, page 74-75]

Aurora Gonzales further stated that Mr. Edwards began to running around the highway with the appellant chasing after him, stabbing Mr. Edwards with a knife.[Volume 3, Reporter's Record, page 58-60] Aurora Gonzales stated that she told

10

her sister that the appellant had just stabbed Mr. Edwards they all ran outside and were yelling, "Tray run, Tray run." [Volume 3, Reporter's Record, page 60]

Aurora Gonzales stated that her sister went up and tried to get between them and tried to get the knife away from the appellant by attempting to kick the knife away but the appellant picked it back up and almost cut her sister's ankle. [Volume 3, Reporter's Record, page 62-63] Aurora Gonzales stated that he sister was in the wrong for trying to get the knife away from the appellant because it distracted Mr. Edwards. She heard Mr. Edwards tell her sister, "[W]ell you're just making me get stabbed more because I can't leave y' all because what if he tries to come after y' all."[Volume 3, Reporter's Record, page 60-61]

Aurora Gonzales stated that Mr. Edwards continued to run around as the appellant was stabbing at him when the officers pulled up. She was asked what exactly were the officers doing when they got there? She responded, "Well, when the officers first got there one officer jumped out of the truck and me and my sister ran up and he pushed us back trying to get us away. Like he pushed us back behind there behind his truck and then the other officer pulled up and they drawed guns.....On Mr. Ince because he wouldn't drop the knife. Aurora Gonzales was then asked if Mr. Edwards had any type of weapon, she responded, "No. He did have a knife but the knife wasn't there at the scene because he [his pants] didn't have any pockets to hold it. The knife was at the house." When asked if there were any there any weapons in the car? She responded, "No, because the officers that were there searched the car because Mr. Ince told the officer that he tried to pull a gun and there was no gun." [Volume 3, Reporter's Record,

11

page 61-63] Aurora Gonzales stated that she never known Mr. Edwards to own a gun. She also testified that she never heard Mr. Edwards threaten the appellant, Mr. Ince that he was going to shoot him or he was going to get a gun. [Volume 3, Reporter's Record, page 68]

Ofelia Sanchez Martinez stated that she was at the Bay Wash Laundry Mat in Rockport on December the 11th, 2011. She said when she got there she saw the appellant Mr. Ince sitting down on a chair reading a book it appeared to her that the appellant had already done his laundry. [Volume 3, Reporter's Record, page 82-84]  It was about an hour later after she had already done her washing and was folding her clothes when Mr. Edwards along with some little girls walked into laundry mat. Mr. Edwards was carrying a basket full of clothes.  Ms. Martinez stated that they put stuff in the washing machine, went on their business.[Volume 3, Reporter's Record, page 85]

Ms. Martinez stated a few minutes later, the appellant confronted one of the girls and asked one of the girls if she had a driver's license. She stated she thought it was odd that the appellant was he asking her if she had a driver's license, but she decided to mind her own business, folding her clothes. [Volume 3, Reporter's Record, page 85-86]

Ms. Martinez stated that she saw the girl walked out and Mr. Edwards walked in and go up to the appellant. When asked how Mr. Edwards confronted the appellant, She stated, "He just went up to him [appellant] and asked him what was he doing talking to his daughter and that he didn't appreciate him talking to her because she was a minor and he [appellant] didn't really say much he just looked at him [Mr. Edwards] and gave him kind of grin. [Volume 3, Reporter's Record, page 86] She stated that Mr. Edwards was

12

not yelling just told him that he didn't appreciate him talking to the girls and that they were minors and he asked him if he wanted to step outside the appellant said no, "I don't want none of this shit." so Mr. Edward turned around, walked outside, and lit up a cigarette.[Volume 3, Reporter's Record, page 86] Ms. Martinez stated that the appellant just sat there for give or take, fifteen, twenty minutes and attempted to talk to the girls as they walked back and forth. Ms. Martinez then stated that the appellant just got up and picked up his bag and started to walk out when he had the door open about three quarters he pulled the knife right before he stepped outside.[Volume 3, Reporter's Record, page 87]

Ms. Martinez stated that she then grabbed her daughter and pulled her to her aside and as she stood there by the door and the little girl started running and screaming hysterically. She then looked outside and she saw the appellant go at Mr. Edwards with a knife. Ms. Martinez stated, "I couldn't see if he [appellant] had literally stabbed him [Edwards] but at that point when he got on the street and he was running, that's when I saw that he [Edwards] had gotten stabbed. She stated that Mr. Edwards was running all over the street trying to get away from the appellant. She heard Mr. Edwards yell at the appellant to leave him alone.[Volume 3, Reporter's Record, page 88] When Ms. Martinez was asked if she heard the appellant say anything to Mr. Edwards her response was, "The only thing I heard him tell him when they were in the street when he was swinging at the other guy was, you stupid nigger. That's all I heard him say." Ms. Martinez stated that she saw Mr. Edwards was running away to get away from the

13

appellant but the appellant managed to get Mr. Edwards a couple of times.[Volume 3, Reporter's Record, page 88-89]

Ms. Martinez said that one of the young girls called the officers, all hysterical, screaming and crying. She said that when the police arrived, "[O]ne came in at an angle where the Stripes store was at. He came in caddy corner, kind of blocked the first street coming westbound. Another cop came in on a different direction to block the street, you know, parked at a certain kind of angle and pulled out a gun." She stated at the arrival of the police the appellant was standing in the middle of the street holding a knife.[Volume 3, Reporter's Record, page 89-90]

Ms. Martinez stated that she couldn't recall if the appellant dropped the knife because she was trying to pull the one of the girls away because the girl went up to the appellant and tried to grab him the girl told the appellant to leave her dad alone. Ms. Martinez was trying to get the girl away from the appellant and to keep the other little kids on the sidewalk by the laundry mat.[Volume 3, Reporter's Record, page 90]

Ms. Martinez stated she never saw Mr. Edwards attack the appellant. She stated that she never saw Mr. Edwards in possession of a weapon nor did she hear Mr. Edwards threaten the appellant with a gun or any other weapon. She did say that she saw the appellant stab Mr. Edwards and Mr. Edwards running around trying to avoid being stabbed by the appellant.[Volume 3, Reporter's Record, page 91, 107-109]

Mario Gracia, testified that his career as peace office has spanned almost 33 years and is currently retired after twenty-four years with the Rockport Police Department. [Volume 3, Reporter's Record, page 116] Mario Gracia testified that on the date of the

14

offense December 11, 2011, he was employed and on duty with the Rockport Police Department. On that day he was dispatched to the Bay Wash Laundry Mat in Rockport for a reported assault. Within a minute or two after he received the dispatch he arrived at the laundry mat. Officer Gracia stated that when he arrived at the scene he saw a large group of people, some standing in front of the Bay Wash Laundry Mat and others standing partially on the roadway. [Volume 3, Reporter's Record, page 116-117] Officer Gracia stated when he had arrived, he saw that Officer Ford had already pulled up, so he pulled up behind him. Officer Gracia then saw that Officer Ford had already gotten out of his patrol vehicle and had his weapon drawn and pointed it at a white male subject, they later identified as the appellant Allen Ray Ince. [Volume 3, Reporter's Record, page 116] Officer Gracia stated that the appellant was standing in the roadway with a knife in his hand and the appellant was bloodied. Officer Gracia then drew his own weapon after seeing that the appellant had a knife in his hand and he and Officer Ford both ordered the appellant multiple times to drop the knife. The appellant did not comply at first but eventually he did drop the knife. Officer Gracia stated that he collected the knife as evidence.[Volume 3, Reporter's Record, page 117-119 see State's Exhibits #8-28]

Officer Gracia testified that another person who was identified as Artavias Todd Edwards was also at the scene and he noticed that Mr. Edwards was injured. Officer Gracia seeing the wounds on Mr. Edwards described Mr. Edwards' chest wound as terrible, stating that blood was coming out of Mr. Edwards' chest, while not exactly squirting, it was coming out to where it made his whole upper torso red. [Volume 3, Reporter's Record, page 120-122] After describing Mr. Edwards chest wound Officer

15

Gracia was shown a photograph of the knife that Officer Gracia identified as being the one Officer Gracia had taken from the appellant. The knife was described as a folding knife that measured eight inches long when opened and there was blood on the knife. [Volume 3, Reporter's Record, page 124-126] It was Officer Gracia's opinion based on his training and experience that the knife used by the appellant in such a manner that it caused the kind of chest wound injury that Mr. Edwards received, said knife would that be capable of causing death or serious bodily injury. [Volume 3, Reporter's Record, page 121-122, 124, 134]

Officer Gracia also noted that there were blood splatters on the parking lot of the laundry mat and along the way on Market Street on the asphalt as you would travel in a south easterly direction towards the intersection of Market and the scene over the yellow center stripe. Upon seeing the blood splatter and where it indicated to Officer Gracia the direction that they were going, he stated, "[T]hat they were-- when they were having their altercation -- that they were headed in the south easterly direction as I mentioned before, towards the intersection of Market and Magnolia."[Volume 3, Reporter's Record, page 126-130] Office Gracia stated that there were no weapons found on Mr. Edwards nor were there any weapons found in Mr. Edwards vehicle. [Volume 3, Reporter's Record, page 140-141]

Officer Steven Reyes testified that he is employed by the Rockport Police Department as a patrol officer for about five years. He stated that on December 11th, 2011he was dispatched to the Bay Wash Laundry Mat. And when he got to the laundry mat there were other officers present. He said he saw the an officer's patrol unit parked

on the road way on the westbound lane in the middle of the road. He saw that the officer was out of the unit and had his firearm drawn on a white male suspect which Officer Reyes' knew to be the appellant Mr. Ince. Officer Reyes stated that he heard the officers yelling at appellant to drop the knife he was carrying and saw that Officer Gracia had arrived with him so they were both drawing down on the appellant.[Volume 3, Reporter's Record, page 144-146]  The appellant was given several commands to drop the weapon till he finally dropped it.  Once Officer Reyes had taken appellant Mr. Ince into custody, he was able to pay attention to Mr. Edwards' condition. [Volume 3, Reporter's Record, page 145-146,149]  Officer Reyes described Mr. Edwards' chest wound by stating, "I just remember the blood shooting out whenever -- it looked like every time there was a heartbeat, blood would just pump out."[Volume 3, Reporter's Record, page 149] Officer Reyes stated that based on his training and experience, the knife, in the manner of its use by the appellant was capable of causing death and serious bodily injury and that he would classify the knife as a deadly weapon. [Volume 3, Reporter's Record, page 148]

Artavias Edwards testified that he is Forty-three years old.  Mr. Edwards stated that a few years ago, on December 11th, 2011 he was at the Bay Wash Laundry Mat with his ex-girlfriend's kids, Virginia and Aurora Gonzales and one of their friends. [Volume 3, Reporter's Record, page 159] When they arrived at the laundry mat the appellant was already there.  Mr. Edwards stated after they had brought in the clothes, he went outside and smoked a cigarette because you can't smoke in the inside. [Volume 3, Reporter's Record, page 159-160]  While Mr. Edwards was outside smoking a cigarette, Virginia Gonzales come out to tell him that the appellant was inside the laundry mat was

17

bothering her and that she looked scared. [Volume 3, Reporter's Record, page 159-160]

Mr. Edwards further stated that he was having problems trying to basically figure it out what was going on but Virginia just had a look like she was afraid. Virginia told him that appellant had touched on her and questioning her like how old she was and, you know, where she lived, that type of stuff. [Volume 3, Reporter's Record, page 160-161] The appellant's actions concerned Mr. Edwards so he went into the laundry mat and asked him not to speak to them or question them. Mr. Edwards testified that he was calm and not abusive when you spoke to the appellant. Mr. Edwards stated that his conversation with the appellant was all calm at first but the appellant gave him a crazy look and he was trying to continue on the conversation when he mentioned again that he didn't want the appellant speaking to the girls the appellant he made a statement to him that the appellant "would kill them little nigger lovers." Mr. Edwards stated at that point he was worried about the kids so he tried to draw the appellant away from them so he said to the appellant to come let you and me talk. [Volume 3, Reporter's Record, page 160-163]

Mr. Edwards said that the altercation started when the appellant jumped up, and came at him a high rate of speed, and they both come through the door. Mr. Edwards said that the appellant was swinging at him and rushing at him. Mr. Edwards stated, "I was trying to defend myself but my main thing was trying to get him [appellant] away from the kids, so I kept backing out away from the door of the laundry mat to put more distance between him and the kids because he [appellant] had a knife on his belt.[Volume 3, Reporter's Record, page 164] Mr. Edwards stated that he was not carrying any kind of weapon nor did he threaten the appellant him in any way. Mr. Edwards stated that he did

not threaten to shoot the appellant with a gun nor threaten to stab him with a knife. [Volume 3, Reporter's Record, page 164-165]

Mr. Edwards stated the first couple times that he was stabbed he did not realize he had been stabbed so it had to be at some point between the time that he came through the door to come outside until the time that we made it out on to the street. Mr. Edwards stated that he tried to run from the appellant in a circle to see if he would follow him and he kept doing that but at first I was trying to move away from the appellant to avoid an altercation, tried to keep it going but as he kept moving away from the appellant the appellant kept pursuing him so they ended up fighting more. Mr. Edwards stated that he could not just run off since he believed that the appellant's threat saying that he would kill them, and he didn't have any faith that any of the other people there would protect the kids so he felt that he couldn't just run off and leave them behind.[Volume 3, Reporter's Record, page 165-166] Mr. Edwards stated that he continued to fight in the street because he had realized that he was being stabbed and trying not to fight was going to get him killed so he felt he had to try to defend himself even though he was unarmed. [Volume 3, Reporter's Record, page 166]

Mr. Edwards identified the appellant as the person who had stabbed him in the center of his chest and on his left arm, shoulder and bicep Mr. Edwards stated that he stab wounds were extremely painful and he spent two or three weeks in the hospital and that he was in critical condition for a while and was in the critical care unit after that. Mr. Edwards medical records were submitted into evidence marked as State's exhibit number 29.[Volume 3, Reporter's Record, page 178]

19

The appellant Allen Ray Ince testified that on December 11, 2011. He was at the Bay Wash Laundry Mat reading a book. He stated that he frequently goes there to read the newspaper looking for a job. The appellant stated that he remembered Mr. Edwards coming into the laundry mat with some girls. Appellant stated that before Mr. Edwards came in the appellant had jokingly asked one of the girls if she had a driver's license, and she said no. [Volume 4, Reporter's Record, page 5-7] Appellant then stated that Mr. Edwards walks in and tells him don't talk to my daughters and he said okay. The appellant then said that Mr. Edwards said that wasn't good enough, let's take it outside and he told him okay. [Volume 4, Reporter's Record, page 8] He stated as he walked out the door Mr. Edwards was pulling his shirt off, threw it on the hood of the car. The appellant then said that he put his book away in his satchel. [Volume 4, Reporter's Record, page 9] The appellant then went outside because the Mr. Edwards had called him outside. The appellant then said that Mr. Edwards charged him as soon as he went out the door.[Volume 4, Reporter's Record, page 10] The appellant then said that as soon as Mr. Edwards had charged him the appellant pulled his knife out and moved back with his knife in this hand holding it stuck out and Mr. Edwards ran into the knife impaling himself on the knife as Mr. Edwards charged him. [Volume 4, Reporter's Record, page 12] The appellant stated that they ended out on the street and It was going back and forth. They were going back and forth. Appellant claimed that Mr. Edwards even after seeing the knife in the appellant's hand would run in on the appellant and try to swing two or three times and the appellant would cut him. The appellant never claimed to have chased Mr. Edwards and that he was merely trying to defend myself and keep Mr. Edwards away

20

from his vehicle.  [Volume 4, Reporter's Record, page 12-13] The appellant remembered cutting Mr. Edwards twice. The appellant stated that Mr. Edwards told him that while he was in the street he said he's got a gun in the car and he's going to kill me. [Volume 4, Reporter's Record, page 13-14]

On cross examination the appellant admitted that it was his testimony that after he steps out of the laundry mat Mr. Edwards attacked him but he managed to pull his folding knife out and opened and hold it high enough to where Mr. Edwards impaled himself in the chest.[Volume 4, Reporter's Record, page 18-19, 25]   The appellant also admitted that at this point in time Mr. Edwards backed away and he backed away too. The appellant admitted that he could have gone back into the laundry mat away from Mr. Edwards but he didn't. [Volume 4, Reporter's Record, page 25]  The appellant admitted to following Mr. Edwards because Mr. Edwards kept charging him. When the appellant was asked, "How can you follow someone that's charging you?" The appellant's response was because he kept turning around charging me. The appellant agreed that if Mr. Edwards was charging him he would not have to follow him because he would be coming to him However the appellant stated that when Mr. Edwards would back away the appellant would go forward.  [Volume 4, Reporter's Record, page 26-27] The appellant also admitted that Mr. Edwards was unarmed and the appellant was the only one armed with a weapon. The appellant further stated that Mr. Edwards never landed a punch on him. [Volume 4, Reporter's Record, page 31-32]

SUMMARY OF ARGUMENT

The appellant argues in his brief that the State failed to provide legally and factually sufficient evidence at jury trial to support the appellant's conviction for aggravated assault beyond a reasonable doubt. The State provided enough evidence for a rational trier of fact to convict the appellant.

ARGUMENT

**Reply to Appellant's Point of Error #1:** The evidence is legally sufficient to sustain the guilt of appellant.

Standard of Review

Since 1981, the Court of Criminal Appeals has directed that the sufficiency of evidence to support a conviction be determined by application of the Fourteenth Amendment due process standard developed by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). As the Texas Court of Criminal Appeals explained first in *Griffin v. State*, 614 S.W.2d 155 (Tex.Crim.App.[Panel Op.]1981). "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 159, quoting from *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. The reviewing court is "not to sit as a thirteenth juror reweighing the evidence or decide whether *we* believe the evidence established the element in contention beyond a reasonable doubt; rather, we are to ask ourselves whether the trier of fact, acting rationally, could have found the elements

22

beyond a reasonable doubt." *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex.Crim.App.1988)(emphasis in original). Where a record contains historical facts that support conflicting inferences, the reviewing court must assume that the trier of fact resolved those conflicts in favor of the prosecution and must defer to that resolution. *Farris v. State*, 819 S.W.2d 490 (Tex.Crim.App.1990). This rule applies to circumstantial evidence cases as well as others. *Houston v. State*, 663 S.W.2d 455 (Tex.Crim.App.1984). The jury may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when giving effect to the inferences that may be reasonably drawn from the evidence. *Booker v. State*, 929 S.W.2d 57, 60 (Tex.App. – Beaumont 1996, pet. ref'd).

Argument and Authorities

In his first issue, appellant challenges the legal sufficiency of the evidence to support his conviction for aggravated assault, claiming that the State did not disprove appellant's affirmative defense of self-defense. According to appellant, he acted in self-defense because he feared the Mr. Edwards would go to his vehicle and get his gun to shoot him.

A person is justified in using force against another person when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use of or attempted use of unlawful force. *See* TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2009). A person has the right to defend against a

reasonable appearance and apprehension of apparent danger to the same extent as actual danger. *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984).

The appellant Allen Ray Ince testified that he was at the Bay Wash Laundry Mat and remembered Mr. Edwards coming into the laundry mat with some girls. Appellant stated that before Mr. Edwards came in the appellant had jokingly asked one of the girls if she had a driver's license, and she said no. Appellant then stated that Mr. Edwards walks in and tells him don't talk to my daughters and he said okay. The appellant then said that Mr. Edwards said that wasn't good enough, let's take it outside and he told him okay.

The appellant then said that Mr. Edwards charged him as soon as he went out the door and that was when he pulled his knife out and moved back holding the knife out when Mr. Edwards he ran into the knife impaling himself on it as Mr. Edwards charged him. The appellant never claimed to have chased Mr. Edwards and that he was merely trying to defend myself and keep Mr. Edwards away from his vehicle. The appellant remembered cutting Mr. Edwards twice. The appellant stated that Mr. Edwards told him that while they were in the street that he said he's got a gun in the car and he's going to kill him.

On cross examination the appellant admitted that he could have gone back into the laundry mat away from Mr. Edwards but he didn't. The appellant admitted to following Mr. Edwards because Mr. Edwards kept charging him. When the appellant was asked, "How can you follow someone that's charging you?" The appellant's response was

because he kept turning around charging me. The appellant agreed that if Mr. Edwards was charging him he would not have to follow him because he would be coming to him however, the appellant stated that when Mr. Edwards would back away the appellant would go forward. The appellant also admitted that Mr. Edwards was unarmed and the appellant was the only one armed with a weapon. The appellant further stated that Mr. Edwards never landed a punch on him.

An accused bears the burden of proving his claim of self-defense by a preponderance of the evidence by producing some evidence in support of that claim. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see* TEX. PENAL CODE ANN. § 2.04(d) (Vernon 2003). Once the accused produces such evidence, the burden of persuasion falls upon the State to disprove evidence of the defense. *Id*. at 913-14. The State's burden of persuasion is not one that requires the production of evidence; rather, it requires only that the State prove its case beyond a reasonable doubt. *Id*. at 913. The issue of self-defense is a fact issue for the fact finder and a verdict of "guilty" is an implicit finding rejecting an accused's self-defense theory. *Id*. at 913-14.

The appellant did not present any evidence that he feared for his life after the conversation with Mr. Edwards in the laundry mat because his reason for stepping out of the laundry mat was that he went outside because the Mr. Edwards had called him outside.

The testimony regarding appellant's statements that he was in fear for his life by threats made by Mr. Edwards or that he pulled out his knife only after Mr. Edwards came at him along with the appellant claim that he did not chased Mr. Edwards and that he was

25

merely trying to defend myself and keep Mr. Edwards away from his vehicle because Mr. Edwards told him that while they were in the street that he said he's got a gun in the car and he's going to kill him were contradicted by other witnesses who were present at the scene.

Ofelia Sanchez Martinez stated that she was at the Bay Wash Laundry Mata and saw the appellant Mr. Ince confronted one of the girls and asked one of the girls if she had a driver's license. She stated she thought it was odd that the appellant was he asking her if she had a driver's license. She then saw the girl walked out and Mr. Edwards walked in and go up to the appellant. She stated that Mr. Edwards just went up to the appellant and asked him what was he doing talking to his daughter and that he didn't appreciate him talking to her because she was a minor. Mr. Edwards was not yelling just told him that he didn't appreciate him talking to the girls and that they were minors and he asked him if he wanted to step outside the appellant said no, "I don't want none of this shit." so Mr. Edward turned around, walked outside, and lit up a cigarette.

Ms. Martinez said that the appellant just sat there for give or take, fifteen, twenty minutes and attempted to talk to the girls as they walked back and forth. Ms. Martinez then stated that she saw the appellant get up and picked up his bag and started to walk out but when he had the door open about three quarters she saw the appellant pull a knife out *before* he stepped outside. Ms. Martinez stated that as she stood there by the door she looked outside and she saw the appellant go at Mr. Edwards with a knife. Ms. Martinez stated, that she couldn't see if he appellant had stabbed Edwards, but at that point that Mr. Edwards had reached the street and running, she saw that Mr. Edwards had gotten

26

stabbed. She stated that Edwards was running all over the street trying to get away from the appellant. She heard Mr. Edwards yell at the appellant to leave him alone. Ms. Martinez stated that she saw Mr. Edwards was running away to get away. Ms. Martinez stated she never saw Mr. Edwards attack the appellant. She stated that she never saw Mr. Edwards in possession of a weapon. Ms. Martinez stated that she never heard Mr. Edwards threaten the appellant with a gun or any other weapon. She did say that she saw the appellant stab Mr. Edwards and Mr. Edwards running around trying to avoid being stabbed by the appellant.

Ms. Virginia Gonzales testified that the entire time she was at the scene of the assault, she never heard Mr. Edwards ever threaten the appellant Mr. Ince. Ms. Gonzales further testified that Mr. Edwards was did not possess any type of weapon nor was there a gun or any type of weapon in her mother's car. Ms. Gonzales stated that she saw Mr. Edwards running backwards while the appellant was going forward chasing him as they went going back and forth. Virginia Gonzales further stated that Mr. Edwards was not armed nor did he have any weapons at all. She also stated that she saw Mr. Edwards running away from the appellant but the appellant kept running after him.

Aurora Gonzales stated that Mr. Edwards went outside and took off his shirt and his shoes like he was going to fight. She went back to doing the laundry and turned back to see the appellant walking outside. She stated that she saw the appellant walk up to Mr. Edwards and then that's when Mr. Edwards pushed the appellant away. She then saw the appellant hit Mr. Edwards in the face. She further stated that she saw the appellant stab Mr. Edwards as Mr. Edwards was backing away from him. Aurora Gonzales further

27

explained that the first stab was on Mr. Edwards' chest right here by his heart. She saw that Mr. Edwards had pushed the appellant away and the appellant then comes back and hits Mr. Edwards. She further stated that she saw Mr. Edwards back away behind the car and then the appellant with a knife comes at Mr. Edwards and stabs Mr. Edwards as he was backing away from the appellant. After Mr. Edwards was stabbed he takes off running into the street and Mr. Ince followed him stabbing and cutting him about three or four times. Aurora Gonzales said that Mr. Edwards was not hitting at the appellant and that Mr. Edwards was walking backwards and Mr. Ince was just following him everywhere he went. Aurora Gonzales further stated that Mr. Edwards began to running around the highway with the appellant chasing after him, stabbing Mr. Edwards with a knife. Aurora Gonzales stated that Mr. Edwards continued to run around as the appellant was stabbing at him when the officers pulled up. Aurora Gonzales stated that she never known Mr. Edwards to own a gun. She also testified that she never heard Mr. Edwards threaten the appellant nor ever hear him tell the appellant that he was going to shoot him or he was going to get a gun.

Mr. Artavias Edwards testified that he was at the Bay Wash Laundry Mat with his ex-girlfriend's kids, Virginia and Aurora Gonzales and one of their friends. While Mr. Edwards was outside smoking a cigarette, Virginia Gonzales come out to tell him that the appellant was inside the laundry mat was bothering her and that she looked scared. The appellant's actions concerned Mr. Edwards so he went into the laundry mat and asked him not to speak to them or question them. Mr. Edwards stated that his conversation with the appellant was all calm at first but the appellant gave him a crazy look and he was

trying to continue on the conversation when he mentioned again that he didn't want the appellant speaking to the girls the appellant he made a statement to him that the appellant "would kill them little nigger lovers." Mr. Edwards stated at that point he was worried about the kids so he tried to draw the appellant away from them so he said to the appellant to come let you and me talk.

Mr. Edwards said that the altercation started when the appellant jumped up, and came at him a high rate of speed, and they both come through the door. Mr. Edwards said that the appellant was swinging at him and rushing at him. Mr. Edwards stated that he was trying draw the appellant away from the kids, so he kept backing away from the door of the laundry mat to put more distance between them and the kids because Mr. Edwards saw that the appellant had a knife on his belt.

Mr. Edwards stated that he tried to run from the appellant in a circle at first to avoid an altercation but the appellant kept pursuing him so they ended up fighting more. Mr. Edwards stated that he could not just run off because he believed that the appellant's threat to that he would kill the kids and he didn't believe any of the other people at the laundry mat would protect the kids so he felt that he couldn't just run off and leave them behind.

Mr. Edwards identified the appellant as the person who stabbed him in the center of his chest and on his left arm, shoulder and bicep Mr. Edwards stated that he stab wounds were extremely painful and he spent two or three weeks in the hospital and that he was in critical condition for a while and was in the critical care unit after that. Mr. Edwards medical records were submitted into evidence marked as State's exhibit number

29.  Mr. Edwards stated that he was not carrying any kind of weapon nor did he threaten the appellant him in any way.  Mr. Edwards stated that he did not threaten to shoot the appellant with a gun nor threaten to stab him with a knife.

The appellant Mr. Ince was found at the scene by the police holding a bloody knife and was the only one at the scene armed with a deadly weapon.  Mr. Edwards was not found to be in possession of any type of weapon and he was suffering from a serious knife wound to the chest.

On that day he was dispatched to the Bay Wash Laundry Mat in Rockport for a reported assault.  Officer Gracia stated when he had arrived, he saw that Officer Ford had already pulled up, so he pulled up behind him. Officer Gracia then saw that Officer Ford had already gotten out of his patrol vehicle and had his weapon drawn and pointed it at a white male subject, whom they later identified as the appellant Allen Ray Ince who was standing in the roadway with a knife in his hand and the appellant was bloodied. Officer Gracia stated that he collected the knife as evidence.

Officer Mario Gracia, testified that his career as peace office has spanned almost 33 years and is currently a retired after twenty-four years with the Rockport Police Department. Officer Gracia testified that he identified as Artavias Todd Edwards was also at the scene and he noticed that Mr. Edwards was wounded and described Mr. Edwards' chest wound as terrible, stating that blood was coming out of Mr. Edwards' chest, while not exactly squirting, it was coming out to where it made his whole upper torso red. After describing Mr. Edwards chest wound Officer Gracia was shown a photograph of the knife that Officer Gracia identified as being the one Officer Gracia had

30

taken from the appellant. It was Officer Gracia's opinion based on his training and experience that the knife used by the appellant in such a manner that it caused the kind of chest wound injury that Mr. Edwards received, said knife would that be capable of causing death or serious bodily injury.

Officer Gracia also noted that there were blood splatters on the parking lot of the laundry mat and along the way on Market Street on the asphalt as you would travel in a south easterly direction towards the intersection of Market and the scene over the yellow center stripe. Upon seeing the blood splatter and where it indicated to Officer Gracia the direction that they were going in the south easterly direction as I mentioned before, towards the intersection of Market and Magnolia. Office Gracia stated that there were no weapons found on Mr. Edwards nor were there any weapons found in Mr. Edwards vehicle.

Officer Steven Reyes testified that he is employed by the Rockport Police Department as a patrol officer for about five years. He stated that on December 11th, 2011he was dispatched to the Bay Wash Laundry Mat. And when he got to the laundry mat there were other officers present. He said he saw the an officer's patrol unit parked on the road way on the westbound lane in the middle of the road. He saw that the officer was out of the unit and had his firearm drawn on a white male suspect which Officer Reyes' knew to be the appellant Mr. Ince. Officer Reyes stated that he heard the officers yelling at appellant to drop the knife he was carrying and saw that Officer Gracia had arrived with him so they were both drawing down on the appellant. The appellant was given several commands to drop the weapon till he finally dropped it. The appellant was

taken into custody. Once Officer Reyes had taken the appellant Mr. Ince into custody, he was able to pay attention to Mr. Edwards' condition. Officer Reyes described Mr. Edwards' chest wound by stating, "I just remember the blood shooting out whenever -- it looked like every time there was a heartbeat, blood would just pump out." Officer Reyes stated that based on his training and experience, the knife, in the manner of its use by the appellant was capable of causing death and serious bodily injury and that he would classify the knife as a deadly weapon.

Virginia Gonzales was shown some photographs that have been pre admitted. Virginia Gonzales stated that she was familiar with the injuries that the appellant had inflicted on Mr. Edwards. After she examined photographs she described that the photographs she was shown depicted the injuries that Mr. Edwards had received during the assault, such as a stab wound on the back of Mr. Edwards arm between his shoulder and bicep, a stab wound on the inside of his left arm, and a stab wound to Mr. Edwards' chest. Ms. Virginia Gonzales stated that Mr. Edwards taken to the hospital and remained there for about a month.

Contrary to appellant's contention, the evidence does not establish that appellant was reasonable in believing that the use of force was necessary to protect himself from the Mr. Edwards. Appellant presented no evidence that the Mr. Edwards threatened him with any amount of force or provoked him at the time of the incident. Although appellant testified that he feared the Mr. Edwards would hurt him if he got a gun from his car no one else heard or testified about any threats made by Mr. Edwards toward the appellant justifying a claim of self-defense. An accused's testimony alone will not conclusively

prove self-defense as a matter of law. *See Denman v. State*, 193 S.W.3d 129, 133 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd)  An accused bears the burden of proving his claim of self-defense by a preponderance of the evidence by producing some evidence in support of that claim. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see* TEX. PENAL CODE ANN. § 2.04(d) (Vernon 2003). The State's burden of persuasion is not one that requires the production of evidence; rather, it requires only that the State prove its case beyond a reasonable doubt. *Id*. at 913. The issue of self-defense is a fact issue for the fact finder and a verdict of "guilty" is an implicit finding rejecting an accused's self-defense theory. *Id*. at 913-14.

Under the applicable standard of review and based on the evidence and testimony given at  trial, a rational trier of fact could conclude beyond a reasonable doubt that appellant committed the offense of aggravated assault and also could have found against appellant on the self-defense issue.

**Reply to Appellant's Point of Error #2:** The evidence is factually sufficient to sustain the guilt of appellant.

<u>Standard of Review</u>

In conducting a factual sufficiency review, an appellate court reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's determination.  This review, however, must be appropriately deferential so as to avoid an appellate court's substituting its judgment for that of the fact finder.  *Clewis v. State*, 922

S.W.2d 126, 133 (Tex.Crim.App. 1996) If the evidence is found to be factually insufficient, the appellate court is to order a new trial rather than a judgment of acquittal.

The El Paso Court of Appeals in *Taylor v. State*, 921 S.W.2d 740 (Tex.App.– El Paso 1996). adopted the factual sufficiency analysis which it had used for civil cases. That analysis asks whether "there is some evidence of a fact in issue, sufficient that a jury question is warranted, but the evidence will not support a finding in favor of the proponent of that fact in issue." *Taylor*, 921 at 746. That court went on to say that

> [T]he appellate court must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. If the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained. In other words, if there is sufficient competent evidence of probative force to support a finding, a factual sufficiency challenge cannot succeed. [citation omitted] This is true even if the finding is supported by no more than a scintilla of evidence *and even though reasonable minds might differ as to the conclusions to be drawn from the evidence*. [emphasis added] Id.

Appellate courts are not "free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable." *Clewis*, 922 S.W.2d at 135. Due deference must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence. *Johnson v. State*, 23 S.W.3d 1, 10-12 (Tex.Crim.App. 2000).

## Argument and Authorities

The jury found the appellant guilty beyond a reasonable doubt. Its finding that the appellant committed the offense of aggravated assault does not "shock the conscience,"

or appear "manifestly unjust" or "clearly demonstrate bias" as *Clewis* would demand. *Clewis*, 922 S.W.2d at 135.

A logical review of the facts and circumstances surrounding the offense would lead any reasonable trier of fact to find beyond a reasonable doubt that the appellant had in fact intentionally, knowingly, or recklessly caused bodily injury to Mr. Edwards by cutting Mr. Edwards with a deadly weapon to wit a knife that in its use or manner of use is capable of causing death or serious bodily injury.

The appellant Allen Ray Ince admitted that he stabbed and cut Mr. Edwards with his knife. Appellant claimed self-defense and was in fear for his life because he claims Mr. Edwards told him that while they were in the street that he said he's got a gun in the car and he's going to kill him. However appellant first stabbed Mr. Edwards just outside the front door of the laundry mat not in the street.  The appellant admitted that he could have gone back into the laundry mat away from Mr. Edwards but he didn't.  The appellant admitted to following Mr. Edwards because Mr. Edwards kept charging him. When the appellant was asked, "How can you follow someone that's charging you?" The appellant's response was because he kept turning around charging me. The appellant agreed that if Mr. Edwards was charging him he would not have to follow him because he would be coming to him however, the appellant stated that when Mr. Edwards would back away the appellant would go forward.  The appellant also admitted that Mr. Edwards was unarmed and the appellant was the only one armed with a weapon. The appellant further stated that Mr. Edwards never landed a punch on him.  The appellant did not present any evidence that he feared for his life after the conversation with Mr.

Edwards in the laundry mat because his reason for stepping out of the laundry mat was that he went outside because the Mr. Edwards had called him outside. The  testimony regarding appellant's statements that he was trying to defend myself and keep Mr. Edwards away from his vehicle because Mr. Edwards told him that while they were in the street that he said he's got a gun in the car and he's going to kill him were contradicted by other witnesses who were present at the scene.

Ofelia Sanchez Martinez stated that she saw the appellant get up and picked up his bag and started to walk out but when he had the door open about three quarters she saw the appellant pull a knife out *before* he stepped outside. Ms. Martinez stated that Edwards was running all over the street trying to get away from the appellant and she even heard Mr. Edwards yell at the appellant to leave him alone. Ms. Martinez stated she never saw Mr. Edwards attack the appellant. She stated that she never saw Mr. Edwards in possession of a weapon.  Ms. Martinez stated that she never heard Mr. Edwards threaten the appellant with a gun or any other weapon. She did say that she saw the appellant stab Mr. Edwards and Mr. Edwards running around trying to avoid being stabbed by the appellant.

Ms. Virginia Gonzales testified that the entire time she was at the scene of the assault, she never heard Mr. Edwards ever threaten the appellant Mr. Ince.  Ms. Gonzales further testified that Mr. Edwards was did not possess any type of weapon nor was there a gun or any type of weapon in her mother's car. Ms. Gonzales stated that she saw Mr. Edwards running backwards while the appellant was going forward chasing him as they went going back and forth.  Virginia Gonzales further stated that Mr. Edwards was not

armed nor did he have any weapons at all. She also stated that she saw Mr. Edwards running away from the appellant but the appellant kept running after him.

Aurora Gonzales stated that she saw the appellant hit Mr. Edwards in the face. She further stated that she saw the appellant stab Mr. Edwards as Mr. Edwards was backing away from him. She further stated that she saw Mr. Edwards back away behind the car and then the appellant with a knife comes at Mr. Edwards and stabs Mr. Edwards as he was backing away from the appellant. After Mr. Edwards was stabbed he takes off running into the street and Mr. Ince followed him stabbing and cutting him about three or four times. Aurora Gonzales said that Mr. Edwards was not hitting at the appellant and that Mr. Edwards was walking backwards and Mr. Ince was just following him everywhere he went. She also testified that she never heard Mr. Edwards threaten the appellant nor ever hear him tell the appellant that he was going to shoot him or he was going to get a gun.

Mr. Artavias Edwards testified that he tried to run from the appellant in a circle at first to avoid an altercation but the appellant kept pursuing him so they ended up fighting more. Mr. Edwards stated that he could not just run off because he believed that the appellant's threat to that he would kill the kids and he didn't believe any of the other people at the laundry mat would protect the kids so he felt that he couldn't just run off and leave them behind. Mr. Edwards stated that the stab wounds were extremely painful and he spent two or three weeks in the hospital and that he was in critical condition for a while and was in the critical care unit after that. Mr. Edwards medical records were submitted into evidence marked as State's exhibit number 29. Mr. Edwards stated that he

was not carrying any kind of weapon nor did he threaten the appellant him in any way. Mr. Edwards stated that he did not threaten to shoot the appellant with a gun nor threaten to stab him with a knife.

The appellant Mr. Ince was found at the scene by the police holding a bloody knife and was the only one at the scene armed with a deadly weapon. Mr. Edwards was not found to be in possession of any type of weapon and he was suffering from a serious knife wound to the chest. Blood splatters on the parking lot of the laundry mat and along the way on Market Street on the asphalt indicated that Mr. Edwards was running around consistent with witness testimony. It was Officer Gracia's and Officer's Reyes opinions based on their training and experience that the knife used by the appellant in such a manner that it caused the kind of chest wound injury that Mr. Edwards received, said knife would that be capable of causing death or serious bodily injury and be classified a deadly weapon.

PRAYER

The appellant has presented no grounds in his appeal which justify the relief sought. Accordingly, appellee respectfully prays that this Honorable Court affirm the judgment of the trial court in all respects.

Respectfully submitted,
Michael E. Welborn
District Attorney

/s/ Marcelino Rodriguez
Marcelino Rodriguez
Assistant District Attorney
State Bar No. 00797336
P.O. Box 1393
Sinton, Texas 78387
Tel. (361) 364-9390
Fax (361) 364-9490
Email: marcelino.rodriguez@co.san-patricio.tx.us

RULE 9.4 (i) CERTIFICATION

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), I certify that the number of words in this brief, excluding those matters listed in Rule 9.4(i)(1), is 10,949.

/s/ Marcelino Rodriguez
Marcelino Rodriguez
Assistant District Attorney
State Bar No. 00797336
P.O. Box 1393
Sinton, Texas 78387
Tel. (361) 364-9390
Fax (361) 364-9490
Email: marcelino.rodriguez@co.san-patricio.tx.us

CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of July, 2015, a true and correct copy of the above and foregoing instrument was sent via E-File/ hand delivered to Joel Thomas at his address of P.O. Box 1141, Sinton, Texas, 78387.

/s/ Marcelino Rodriguez
Marcelino Rodriguez
Assistant District Attorney
State Bar No. 00797336
P.O. Box 1393
Sinton, Texas 78387
Tel.  (361) 364-9390
Fax  (361) 364-9490
Email: marcelino.rodriguez@co.san-patricio.tx.us